Tyack *v.* Brumley.

---

TYACK and others *vs.* BRUMLEY and others.

The powers given to the master and wardens of the port of New-York by the 5th section of the act of February, 1819, were in the nature of a franchise; and were in their nature exclusive, until the legislature should think proper to repeal or modify the law, or should authorize other persons to perform the same duties.

That statute creates or provides for the appointment of public officers, and devolves upon them certain powers and duties which the interest of the public requires should be performed by persons duly authorized and selected in the mode prescribed by the legislature. And it is a usurpation of power for another body of men, under a different name of office, to attempt to perform the duties assigned to the port wardens and to establish a tariff of fees of office for the discharge of such duties.

Tyack v. Brumley.

The chamber of commerce and the board of underwriters, of the city of New-York, have no right to appoint a board of public agents to discharge the ex officio duties which the legislature has previously imposed upon a board of officers to be appointed by the governor and senate.

Port wardens, by the common law, were not *ex officio* surveyors of damaged vessels or damaged goods. And the exclusive powers originally conferred by statute, upon the master and wardens of the port of New-York, as surveyors, having been taken away by the act of 1819, such master and wardens are no longer *ex officio* surveyors of damaged goods imported into the city of New-York; except in the cases specified in the fifth section of that act, viz: when such damaged goods are required to be sold, by the owner or consignee, on account of such damage, and for the benefit of underwriters who do not reside in New-York.

But as the statute does not prohibit the master and wardens from acting as surveyors in cases not mentioned in the act of 1819, it is proper to have a tariff of fees which shall apply to other surveys, in case they shall be made by such master and wardens, as had been done previous to that act. The granting of a fixed rate of fees for particular services, however, does not, even by implication, give to the master and wardens the exclusive right to perform such services ; nor does it interfere with the right of others to perform similar services for such persons as may think fit to employ them.

THIS was an appeal from an order of the vice chancellor of the first circuit, allowing an injunction. The complainants, the master and wardens of the port of New-York and their clerk, filed their bill in this cause to restrain the defendants from interfering with their duties and franchises, as wardens of the port of New-York. The bill, after stating the appointment of the complainants, and their rights under the act of 1819 relative to the master and wardens, harbor masters and pilots of the port of New-York, alleged that the defendants, intending to injure them in the enjoyment of those rights, and to deprive them of their business and emoluments, had confederated and associated together for the purpose, and with the intent, of usurping the duties of the office of the complainants ; that they had entered into an agreement between themselves to open an office, or place of business, in New-York, for the transaction of the business and the performance of the duties which belonged to, and would otherwise devolve upon, the complainants by virtue of their offices, and had opened an office or place of business accordingly ; that they had issued circulars, holding themselves out to the public as a board of persons who were authorized and competent to

Tyack v. Brumley.

perform, in relation to marine surveys, the duties of the complainants as port wardens; that the said confederates openly and publicly declared that their design was to put down the office of the complainants, by discharging the duties of the same themselves, and to deprive them of the business and emoluments thereof; that for that purpose they had assimilated their association and their mode of doing business, as near as might be, to the organization of the complainants, and had given out that they performed the same duties, and might be relied on by the public as more competent and proper to discharge such duties than the complainants; and that they thereby deceived and deluded persons connected with foreign vessels and merchandize who were unaccustomed to the laws and regulations of the port of New-York, and thereby obtained the business which properly belonged to the complainants, and had exacted and received therefor a large amount of fees which would otherwise have been received by the complainants. The bill also charged that the defendants as such confederates, had made and executed surveys of damaged goods and merchandize, and made and granted certificates, in apparent official form, similar to the certificates granted by the complainants in like cases, on board several vessels in the port of New-York, specified in the bill, in cases contemplated or referred to in the act of 1819 imposing duties belonging to, or which devolved upon the complainants by virtue of their offices; that they had assumed to execute a survey of the ship Florida, in the port of New-York, which was deemed unfit to proceed to sea with her cargo, and were then engaged in such survey; and that the defendants, although requested to discontinue such injurious acts persisted therein, and gave out that it was their deliberate intention to continue the operations of their said board, in opposition to the complainants, and to draw off and deprive them of their business, as far as they were able to do so. The complainants therefore prayed that their exclusive right to perform the business and duties of their said offices, and to receive the fees and emoluments thereof, might be established by a decree of the court; and that the defendants might be perpetually enjoined from molesting them in

Tyack v. Brumley.

the enjoyment thereof; and for an account of the fees and emoluments received, &c. In opposition to the application for an injunction, the defendants put in affidavits, stating that they had not claimed the offices or names of port wardens, or clerk of the port wardens since the appointment of the complainants; but that six of the defendants had been appointed by the chamber of commerce, and by the board of underwriters of the city of New-York, a board of marine surveyors, and the other defendant had in like manner been appointed the clerk of such board. And that they had organized their board accordingly, and opened an office, and given notice that they had been so appointed to survey ships and merchandize; and that they had established a tariff of fees for surveys on board of vessels and on merchandize, and for surveys of vessels put into the port of New-York in distress and needing repairs, and for granting certificates of such surveys. But the defendants denied that they had ever exercised or claimed to exercise the power to sell, or to have sold under their inspection, vessels or goods arrived at the port of New-York damaged, and by the owners or consignees required to be sold at auction, on account of such damage, for the benefit of underwriters out of the city of New-York.

The vice chancellor, after hearing the parties by their counsel, made an order for an injunction; restraining the defendants from disturbing the complainants, or any of them, in the use, enjoyment or exercise of the several duties appertaining to them as the master and wardens of the port of New-York, or as their clerk, or taking the fees thereof; and particularly from acting as surveyors of any vessel deemed unfit to proceed to sea, and from judging or acting as judges of the repairs which might be necessary for the safety of such vessel on her intended voyage; and from selling under their inspection, vessels or goods arriving at the port of New-York damaged, and by the owners or consignees required to be sold for the benefit of underwriters out of the city of New-York, and from certifying the cause of such damage, the amount of sale of such vessel or goods, and the charges attending the sale; and from taking or making any survey on board of any ship or vessel, or at any store in the

Tyack *v.* Brumley.

city of New-York or along the docks or wharves thereof on damaged goods, and from giving or granting any certificate on account of damaged goods; and from taking or making any survey on board of or relating to any ship or vessel put into the port of New-York in distress, to ascertain the damage sustained by her, whether such ship or vessel should pay or be liable to pay foreign duties and tonnage or otherwise; but that the defendants should be at liberty as individuals, and in common with other citizens, to act as surveyors, appraisers of damages, arbitrators or judges, whenever called upon and appointed by the mutual consent and agreement of the owner or consignee, and the domestic or resident underwriter of any ship or vessel arriving damaged, or of goods or merchandize damaged, or be coming damaged on board any vessel in the port of New-York, where all parties having an interest in the vessel and in the prosecution of her voyage, and in the goods, were present and thought proper to dispense with a regular and official survey by the port wardens, and to employ the defendants in their individual and private capacities to perform the service; provided they were not employed as legally constituted surveyors of the port, nor as surveyors to make and certify surveys in the manner and similitude of port wardens' surveys, nor with an intention that their acts should have the force and effect of port wardens' surveys or any other effect than belonged to the acts of individuals in a matter of private business.

The following opinion was delivered by the vice chancellor.

W. T. McCoun V. C.  The complainants are the individuals who compose the board of port wardens of the port of New-York, to which office they were appointed by the governor and senate of the state.  The defendants are an equal number of persons, who have assumed the name of "marine surveyors for the port of New-York," and have undertaken to perform many of the duties which the complainants claim to belong exclusively to them, by virtue of their office; and it is the principal object of the bill in this cause, to restrain the defendants from such interference.  The bill, in the first place, refers to the law

Tyack v. Brumley.

of the state creating the office of master and wardens of the port; and it then shows that the complainants have been duly appointed, and have taken the oath of office, and are in discharge of the duties thereof, and as such incumbents they insist that they are entitled to perform all the duties and transact all the business appertaining to the office, and to receive all the fees and emoluments thereof, but that the defendants, fraudulently intending to injure the complainants in the enjoyment of their office, and to interrupt and disturb them therein, have under various unfounded pretences set about depriving them of their business, and have opened an office contiguous and nearly opposite to the location or office of the complainants, in the same street, from which the defendants have issued a circular and cards of business, holding themselves out to the public as a board of persons authorized and competent to perform the duties of the complainants in relation to marine surveys.

The defendants show by their affidavits, (they not having yet answered the bill,) that having been appointed by the chamber of commerce and board of underwriters of the city of New-York, to survey ships and merchandize, they issued a circular headed "Marine Surveyors' Office" and dated May 25th, 1843, announcing the fact of such appointment and that they had taken an office 67 Wall-street, for the accommodation of merchants and masters of vessels, to be kept open daily throughout the year, and that their charges for surveys would be as follows: for every survey on board vessels and on merchandize, $2; for every certificate of the same, $1; for every survey on vessels put into this port in distress or needing repairs, $2,50; for every certificate of the same, $2,50. They also issued a card in these words, "Marine surveyors, port of New-York, appointed by the Chamber of Commerce, and board of underwriters; office 67 Wall-street," with their names.

The defendants also exhibit a certificate dated, 9th June, 1843, from the chamber of commerce and the board of underwriters, stating that the defendants were appointed by their respective boards as suitable persons to act as marine surveyors for the port of New-York, and recommending them accordingly in all cases

Tyack v. Brumley.

where their services might be required.    Still, in their affidavits they disclaim all interference with vessels or goods arriving at the port of New-York in a damaged state, which may be required to be sold at auction for the benefit of underwriters out of the city of New-York.   They do not however deny, what is very strongly imputed to them in the charging part of the bill, viz: that they have fraudulently combined to injure the complainants, to interrupt them in the enjoyment of their office, and to deprive them of the business and emoluments belonging to it.   Nor do they deny, that they have set on foot the plan of opening and keeping an office for that purpose, and that they do openly and publicly declare, that their design is to put down the office of the complainants by discharging the duties thereof themselves, and that they have assimilated their association and their mode and manner of doing business as near as may be to the organization and arrangement of the complainants; giving out that they perform the same duties and may be relied on as being more competent, and that their acts will be more authentic.   Nor do they deny, that they have held surveys of damaged goods on board of a number of vessels, have granted certificates in apparent official form, similar to certificates granted by the complainants in like cases; and in one instance, (the case of the ship Florida,) which had finished taking in her cargo and while in port had sprung a leak, put themselves forward to make the necessary survey for repairs, and had either made such survey or were then engaged in making it, in defiance of the complainants. Neither do they deny, that the complainants have remonstrated with them and requested them to desist, and that they have refused, and still give out that it is their deliberate intention to continue their opposition, and to use all their influence entirely to supplant them in their official business.

These and other similar charges in the bill, not being denied, must for the purposes of the present application be taken as true. Whether the motives with which this opposition has been got up and is persevered in, as charged, can have any influence upon the question of this court's jurisdiction it may become necessary to inquire.   But the first question to be considered is, what are

the complainants entitled to *virtute officii?*  Is it to the sole and exclusive enjoyment of the business belonging to the office of port wardens as established by law, or is it a business in which they may be only allowed to participate in common with others who may assume to perform the same or similar functions?

The office of port wardens is one of considerable antiquity even here.  It was established by law, during the existence of the colonial government, (1 *Smith & Liv.* 160,) and it has been continued by repeated acts of legislation down to the present time, with but slight alterations.  The last act and the one now in force, so far as regards the powers and duties of port wardens in respect to the present question, was passed Feb. 19th, 1819.  (*Laws of* 1819, *ch.* 18.)  By this law they are made public officers.  They are appointed as such by the governor and senate, and are organized as a board or body politic, under the name of the master and wardens of the port of New-York, with power in that name, as a corporation, to sue for all fines, penalties and forfeitures arising under the act, and to use a common seal.  They take an oath of office; are required to appoint a clerk to keep an office open, where they are to give daily attendance, and where their clerk is to keep a record or book of entries of all their proceedings, which is to be open to the inspection of all persons desiring it.  The arrivals of all foreign vessels are to be reported at their office under a penalty of $50 for each neglect, and certain fees are payable to them with the report of every such vessel.

By the 5th section of the act, (the most important to the present purpose,) their powers and duties with respect to the survey of vessels and damaged goods are declared.  They, or any two of them, with the assistance of one or more skilful carpenters, shall be surveyors of any vessel deemed unfit to proceed to sea.  They or any two of them shall be judges of the repairs which may be necessary for the safety of such vessel on the intended voyage.  And in all cases of vessels and goods arriving damaged, and by the owner or consignee required to be sold at public auction on account of such damage and for the benefit of underwriters out of the city of New-York, such sale shall be under

Tyack *v.* Brumley.

their inspection, and when required by the owner or consignee, they shall certify the cause of the damage, the amount of sale of the vessel or goods, and the charges attending the sale. For these and all other services their compensation is fixed in the shape of commissions and fees.

From this brief analysis of the statute and of the powers it has conferred, and from the fact that a public office is created, and that the persons appointed to fill it are, from the moment they enter upon their duties, public officers, I think it follows, that their powers are and necessarily must be deemed exclusive, such as no other persons without a similar authority of law are at liberty to perform. The statute is of itself a grant of powers to be exercised in the cases specified and in the manner pointed out, for the purpose of subserving the great interests of navigation and commerce in the port of New-York. It is in fact the grant of an office, in the nature of a franchise, like the grant of a ferry or a toll bridge, or of the right to hold a public fair or market; and a similar grant, for like purposes, may at any time afterwards be made to others. (See the great case of the rival bridges, 11 *Peters' Rep.* 420, for the principle.) But without the grant of a rival power from the same authority, individuals have no right to set up a rival office or business, and assume to themselves the performance of the same public duties for the like emoluments. It matters not, in my judgment, whether there be any express prohibition, or restraining law, to prevent such rivalry or not. The grant itself in the case of an office of this sort implies a prohibition against its exercise by others, unless they can show an equal authority. The language of the 5th section is imperative and explicit; the persons holding the office shall be surveyors; they shall be judges of repairs; sales shall be under their inspection ; and they shall certify the cause of damage, the amount, and the charges attending the sale. This is tantamount to saying they shall be the surveyors and the judges and the persons to perform the other prescribed duties, and that no other persons shall possess the same or similar powers.

Then to what does this exclusive power particularly relate, and where is its limit ? It relates to the survey of vessels with

Tyack *v.* Brumley.

a view to ascertain their seaworthiness, and the necessity and extent of repairs to enable them to prosecute the voyage in which they are engaged. It does not of course apply to or include vessels lying in port and requiring ordinary repairs or overhauling previous to taking on board a cargo ; for in all such cases the master and owners being alone interested must be left to determine for themselves the repairs and outfits, and they may or may not, as they shall think proper, call to their assistance third persons to determine for them. But this provision of the law does apply to all cases of vessels actually engaged in the prosecution of a voyage, which have put into port, owing to some disaster or injury sustained, which has interrupted its prosecution ; and also to vessels in port, which having taken cargo on board, and being about to commence a voyage, have sprung a leak or met with some accident to affect their safety on the intended voyage. These are cases in which the regular appointed master and wardens of the port have the exclusive right to hold surveys and to judge of the necessity and extent of repairs, and to give the proper directions therefor.

The reasons for vesting this power in persons selected for their skill, and clothed with public authority, is obvious enough ; there may be others interested in the safety of the vessel besides the master and owners. Shippers of cargo, passengers who have embarked or placed property on board, mariners hired to go the voyage, all have a right to the judgment of impartial and disinterested men as to the safety of the vessel and her ability to proceed to a successful termination of the voyage, whenever any disaster has occurred to the vessel calculated to increase the hazard, or to place their property and lives in greater jeopardy. So with respect to vessels and goods arriving in a damaged state, and which in consequence thereof, are required to be sold for the benefit of underwriters out of the city of New-York, it is conceded by the defendants, that the power belongs entirely and exclusively to the legally constituted master and wardens of the port, to hold the surveys and attend the sales and give the necessary certificates of the result. But it is said they can have no such exclusive and compulsory right when a vessel and goods have

Tyack *v.* Brumley.

arrived in a damaged state, and the same are insured by resident underwriters who are present to look after their own interest in the property. I agree to this proposition. It must be so. The law appears not to embrace the case in terms, and there is no reason why it should. The owner or consignee and the underwriters, being on the spot and seeing the damage, may agree upon the amount to be paid for loss, without a previous survey; or they may select any person to appraise the damage, and agree to abide by his report, or award. Or if they should deem a sale of the damaged property advisable, they may agree upon an auctioneer, and the time and place of sale, and may attend to see that the sale is fairly conducted; and having the result before them, they can then adjust and settle the account of loss. So likewise if the property should be abandoned to the underwriter; he being present may at once agree to accept it and pay for a total loss, and immediately take possession and dispose of the property in his own way; for in all such cases there is no necessity for the intervention of the law through the medium of public officers. But if a regular and formal survey should be deemed advisable or expedient for any purpose, on board of any ship, or vessel, or at any store in the city of New-York, or along the docks or wharves thereof, on damaged goods, or on board of any ship or vessel put into the port in distress, to ascertain the damage sustained; whether with a view to a sale at auction or not, then it appears to me, the port wardens are the only persons who can properly and legitimately make the surveys. Because the law has prescribed certain fees which they shall be allowed to take for every such survey, and for every certificate given in consequence of finding damaged goods, and for every certificate of damages sustained by every ship or vessel which has put into the port in distress. A grant of fees or perquisites seems to me necessarily to include within it a grant of the power or authority to perform the service for which the fees are given; and it follows also, that the grant is and must be of an exclusive character.

The words quoted from the latter part of the 5th section are to this effect; and this construction does not conflict with the lib-

erty, which the parties in interest have, to dispense with surveys altogether, by their mutual agreement, in the cases which I have supposed, or to call in third persons, of their own choosing, to perform a mere friendly, unofficial act between them. But such persons cannot be employed as legally constituted surveyors of the port; nor as surveyors to make and certify surveys in the manner and similitude of port wardens' surveys; nor with the intention that they shall have the same force and effect, or any other effect than belongs to the acts of mere individuals in a matter of private business.

There is another class of cases which clearly belong to the supervision of the port wardens, and in which their services cannot be dispensed with; although there may be no necessity for effecting a sale either of the vessel or goods arriving in a damaged state, within the letter of the statute. These are cases in which the government is concerned, in respect to duties. The act of congress (1 *Story's Laws of the U. S.* 625, § 60,) provides for the unloading of vessels free from duty, which arrive in distress at ports to which they are not bound, upon the production to the collector, among other things, of the certificate of the port wardens of the port, showing the necessity of unloading the vessel. If there are such officers as port wardens at the place of arrival, they are the persons, primarily and exclusively, entitled to hold the surveys and to grant the certificates, and the collector is not authorized to receive the certificates of any other persons; but if there are no such officers at the place, then the certificate of other persons may be received. If there are any other provisions in the revenue or navigation laws of the country, having reference to official acts of port wardens as evidence for any purpose, then it is also clear, that in all these cases they have a right to perform the service, exclusively of all other persons, unless the law admits of a concurrent authority and right in others to do the same thing.

Having thus shown what appears to be the just conclusion in regard to the law conferring powers upon the port wardens, and having pointed out in what particulars it is a grant of exclusive powers in virtue of their office, and in what cases their services

Tyack v. Brumley.

may be dispensed with, I would now observe, that the appointment which the defendants have so publicly exhibited from the chamber of commerce and the board of underwriters, can be of no avail to them against the legal rights of the complainants. If by that appointment it was intended, as it purports on its face, to clothe the defendants with authority as "marine surveyors for the port of New-York," to act in all cases where surveys might be required of vessels or merchandize, and to perform the same duties in all respects as port wardens, then they have greatly mistaken the law and the powers which these mercantile institutions possess, however venerable the one and highly respectable both may be. They have no authority to make such an appointment, or to sanction the establishment of a self-constituted and organized body of persons, for the purpose of supplanting the lawfully constituted board of port wardens. Such an attempt would be but an act of insubordination to the laws of the state, if not a downright usurpation of the powers of government, which it is hardly to be supposed could have been contemplated or intended. It is much easier to believe, that what is made to assume the appearance of an appointment of public officers, and the establishment of a rival office of marine surveyors, was designed merely to recommend the individuals named as suitable persons to be employed in making surveys of sea damage, wherever they can be thus employed without encroaching upon the rights of the complainants. And it is to be regretted that, in granting that favor, they had not used words in that limited sense, instead of recommending them as "marine surveyors for the port" in all cases, without discrimination. It may be further observed, that if the office of port wardens, as established by law, is a monopoly, and for that or for any other reasons of state policy or expediency at this day ought to be suppressed, and the business thereof thrown open to free competition; or if the incumbents, for the time being, are not so competent or well skilled as others may think themselves, or be thought by others to be, to discharge its duties, it is not for individuals or mercantile associations or combinations of any sort to take the law into their own hands and treat it as a dead letter. So long as a law

Tyack *v.* Brumley.

remains unrepealed, it must be respected and obeyed, although it may seem to operate harshly by conferring exclusive rights and privileges on the few, at the expense of the many. Courts of justice are bound to aid a party in possession of rights, whether they be natural or artificial, or such as are the mere creations of law, whenever those rights have been infringed, or their destruction is threatened. In the one case, the grievance is redressed by the award of damages—in the other, a preventive remedy may be sought for in the extraordinary powers of a court of equity. Then is the present case one which calls for the latter remedy, and is it within the well established bounds of this court's jurisdiction to grant it? It is objected that there is a remedy at law. This may be very true, but it does not follow that chancery may not interfere. An action on the case, every time the complainants' rights are invaded, would be extremely troublesome. It might keep the complainants constantly on the alert to find out when they were injured, and where to procure the necessary witnesses to prove it, and from the frequency of the acts, many of them might escape detection. The remedy by information in the nature of a quo warranto, or by indictment, as for a misdemeanor, which were suggested in argument, even if the case is within the provisions of the statute on either of those subjects, which is at least doubtful, (2 *R. S.* 581, § 18; *id.* 696, § 39,) might not afford that full and adequate relief to which the complainants are entitled. It is an old saying, that prevention is better than cure, and it holds good in cases of this sort.

Again; it is contended that the complainants should establish their rights by a judgment at law, before coming into the court of chancery. This the court will sometimes require. In cases of doubt or difficulty upon the law, or the facts, it is discreet to await the decision of a court of law upon the legal right set up. But where a clear case of a statutory, or common law right is presented, and the party is in the possession and enjoyment of the right, which is being daily and continually violated, this court may, and often does, interfere without waiting the previous action of another court. (9 *John. Rep.* 569, 570, *and* 585, 587.)

Tyack v. Brumley.

Wit¹ regard to the jurisdiction of the court of chancery, in cases of this sort, I think it is abundantly established. Cases have occurred perfectly analagous in principle, in which the power of this court by injunction has been exercised without hesitation, and such cases are high authority as precedents. Indeed, it has become a familiar head of equity jurisdiction to protect, by injunction, statutory rights and privileges which are threatened to be destroyed, or rendered valueless to the party by the unauthorized interference of others. The first case I shall refer to, is *The Croton Turnpike Company* v. *Ryder*, (1 *John. Ch. R.* 611,) where Chancellor Kent held it to be settled, that an injunction is the proper remedy to secure to a party the enjoyment of a statute privilege of which he is in the actual possession, and when his legal title is not put in doubt. The English books, he observed, were full of cases arising under this head of equity jurisdiction ; but it was unnecessary to enter into a discussion of them, for the point had been then recently settled in this state on an appeal in the case of *Livingston & Fulton* v. *Van Ingen et al. in error*, (9 *John. Rep.* 507.) The jurisdiction he considered very benign and salutary ; for without it the party would be exposed to constant and ruinous litigation, as well as to have his rights excessively impaired by frauds and evasion. The case referred to deserves a farther notice as being peculiarly applicable to the one in hand. It arose out of the grant of the legislature to Messrs. Livingston and Fulton, of an exclusive right to navigate the waters of the Hudson, by steamboats, for the period of thirty years. The defendants, disregarding that act of the legislature, built and put a steamboat upon the river, in opposition to the complainants. They filed their bill for an injunction, and upon an order to show cause before the then Chancellor Lansing, he refused the injunction, upon which the complainants appealed to the court for the correction of errors. The defendants insisted, that the grant was void on two grounds ; 1st. That it interfered with the power which belonged entirely to congress to promote the progress of science and the useful arts by securing to authors and inventors the exclusive right for limited times ; and 2d. That it

interfered with another power vested in congress by the consti
tution, viz. that of regulating commerce with foreign nations,
and among the several states. And furthermore, that, if the
grant was such as the state legislature had a right to make,
the complainants should be left to the remedy which the
legislature had in the act itself provided, viz. a forfeiture of the
boats; and that at all events the court of chancery ought not
to interfere by injunction until those questions of law were de-
termined, and the complainants' right to the exclusive naviga-
tion of the river was established. It was, however, decided by
the unanimous opinions of the judges, to be a proper case for
the interference of the court by injunction, even in that prelim-
inary stage of the cause. That the chancellor ought to have
granted it, enjoining the defendants until the hearing of the
cause; and then to be made perpetual, if the claim should be
sustained. And the cause was remitted to the chancellor, with
directions to issue the injunction. Although some years after-
wards the Livingston and Fulton monopoly of steamboat navi-
gation in the waters of New-York was destroyed, by the
decision of the supreme court of the United States, in the great
case of *Gibbons* v. *Ogden*, (9 *Wheat. Rep.* 1,) upon the consti-
tutional objection of its grant being repugnant to the power
vested in congress to regulate commerce, which was held to be
exclusively there, and no part of which could be exercised by a
state; yet that decision did not reach the point of chancery
jurisdiction, to sustain a statutory right, or privilege, under a
supposed valid grant, by its injunction, and that, too, in the in-
ception of the controversy, before the merits can be finally deter-
mined. So far from its impugning the doctrine of the state
court upon that subject, the same high tribunal, in the case
of *Osborn* v. *The Bank of the United States*, (9 *Wheat.* 739,)
decided at the same term, held that an injunction was properly
granted to prevent the franchise of a corporation from being
destroyed, as well as to restrain a party from violating it by at-
tempting to participate in its exclusive privileges. The remarks
of Chief Justice Marshall, in his opinion of that case, in pages

Tyack *v.* Brumley.

841, 842, have a strong bearing in more respects than one on the case in hand.

In *The Newburgh Turnpike Co.* v. *Miller*, (5 *John. Ch. R.* 101,) Chancellor Kent again holds to this general doctrine, that where one has a grant of a ferry, bridge, or road, with the exclusive right of taking tolls, the erection of another ferry, bridge, or road, so near to it as to create a competition injurious to such franchise, is, in respect to such franchise, a nuisance, and this court will grant a perpetual injunction to secure the enjoyment of the statute franchise, and prevent the use of the rival establishment.

I may safely rest upon these authorities as perfectly decisive of the present application, for I know not how to distinguish this case in principle, or on what ground to place it, where it will be beyond the reach of their direct influence.

It is unnecessary, therefore, to consider very particularly another ground on which the extraordinary powers of a court of equity are sometimes invoked. It is this—that supposing the complainants have not the exclusive right to perform the duties which port wardens have been accustomed to perform, yet, being organized as a board, or public office, the defendants have no right, with the motives and intentions imputed to them and not yet denied, to establish a rival office with a precisely similar organization for doing business. That although they have adopted a different name, it is such an assimilation of their business and calling, with that of the complainants, as is calculated to mislead the public, and to produce deception and fraud. Numerous cases have occurred of that character, in which the court, both here and in England, has promptly interfered to prevent the mischief. One of the most striking is the *Omnibus case*, (2 *Keen's R.* 213,) cited by the chancellor in *Bell v. Locke*, (8 *Paige*, 76.) There an injunction was granted, and was sustained upon an appeal; to prevent the defendant from running an omnibus, having upon it such names, words and devices, as to form a colorable imitation of the names, words and devices, which had previously been placed on the omnibuses of the plaintiff, with the evident intention of obtaining a part of the

Tyack v. Brumley.

business by misleading and deceiving the public. According to the bill of the port wardens, their case would seem to be brought within that principle. But it is not necessary to place the decision which I am now called upon to make, upon that ground. The other view of the case, which I have endeavored to present, entitles the complainants, in my opinion, to an injunction, though not to the full extent prayed for; inasmuch as the defendants, individually, have a right, in common with all other citizens, to be employed to make surveys, to appraise damages, and arbitrate whenever called upon, or requested to do so by the mutual consent of the owner, or consignee, and the domestic or resident underwriters upon vessels, or goods arriving damaged, or becoming damaged in port, where all parties in interest are present and think proper to dispense with a regular and official survey by the port wardens, and to employ them in their private capacities as citizens, or individuals, to perform the service. With this modification, or exception, the injunction must be granted as prayed for.

There is another objection, rather of form than of substance, which was taken upon the argument, and must not be entirely overlooked. The objection is, that the bill is erroneously filed in the individual names of the master and wardens, and their clerk, and that it should be in their corporate name. This objection, I think, is not well taken. They are a corporation for certain purposes, that is to say, they have a name in law by which they may sue for fines and penalties, which the law itself imposes in certain cases. But in all other cases, and in all matters of business, they are so many individuals associated together for one common object, in which they are all interested, and the income and emoluments of which are equally divided among them. They have a common benefit, and bear a common burthen as partners; and for any injury, or disturbance which affects that common interest, I can perceive no difficulty in allowing them to pursue the appropriate remedy in their own proper names.

Tyack *v.* Brumley.

*F. B. Cutting*, for the appellants.

*B. F. Butler & H. S. Mackay*, for the respondents.

THE CHANCELLOR.   The principal question in controversy· between these parties at the time of the making of the order appealed from, has since been disposed of; by the act of March, 1844, declaring the rights, and for the relief, of the master and wardens of the port of New-York.   By that act, the defendants, as well as all other persons, are expressly prohibited from performing, or exercising, or attempting to perform or exercise, any of the powers, functions, or duties of the master or wardens of the port of New-York, conferred on, or required of them by law, or by the act of February, 1819, or from receiving any fee or reward for any such service; which powers, functions and duties are declared to be exclusively vested in, and to belong to, the master and wardens of the port of New-York, by virtue of their offices. (*Laws of* 1844, *p.* 81, § 1.) Under that act, whatever the complainants are authorized to do by virtue of their offices, the defendants and all others are prohibited from doing, under a heavy penalty.   It appears to be useless, therefore, to spend much time in examining the question, whether the powers of the complainants in this respect were exclusive before the passage of the act of March, 1844.   I agree, however, with the vice chancellor, that the powers given to the complainants by the fifth section of the act of February, 1819, (*Laws of* 1819, *p.* 13,) were in the nature of a franchise, and in their nature exclusive, until the legislature should think proper to repeal or modify the law, or should authorize others to perform the same duties.   The statute creates, or provides for the appointment of public officers, and devolves upon them certain powers and duties which the interest of the public requires should be performed by persons duly authorized and selected in the mode prescribed by the sovereign power of the state.   It was a palpable usurpation of power, therefore, for another body of men to attempt, under a different name of office, to perform

VOL. I.                    68

the duties assigned to these officers, and to establish a tariff of fees of office for the discharge of such duties.

I have no doubt that the chamber of commerce, and the board of underwriters of the city, would be perfectly safe persons to entrust with the selection of officers to perform these particular duties.   But the sovereign power of the state had not thought proper to entrust them with that selection.   They therefore mistook the duty which they owed that sovereign power, when they assumed to constitute a board of public agents, to discharge the duties which the legislature had conferred upon a board of officers to be appointed by the governor and senate.

The injunction granted in this case is too broad, however; as it protects the complainants in the enjoyment of privileges which are not conferred upon them by the act of February, 1819, and which do not therefore belong to them by virtue of their offices. Port wardens, by the common law, were not *ex officio* surveyors of damaged vessels or damaged goods.   The only exclusive powers which the complainants can rightfully claim then, as surveyors, are those which are conferred upon them by statute. By the colonial act of 1761, to prevent frauds in the sale of damaged goods imported into this colony, (1 *Van Schaack's Laws*, 394,) all damaged goods sold for account of the insurers were required to be surveyed by the master or one of the wardens of the port of New-York, and to be sold at public vendue under his direction.   And he was to give a certificate of such survey and sale, and was allowed certain fees for his services. Two years afterwards, the provisions of an act of 1759 were re-enacted, whereby the master and wardens of that port were by statute appointed ex officio surveyors for the surveying of all damaged goods brought into the port of New-York in any ship or vessel; and were, with the assistance of one or more able carpenters, to survey all vessels that should be deemed unfit to proceed to sea, and to give certificates under their hands and seals, &c.   And fees were allowed them for such surveys and certificates.   The act also declared that no survey on such goods or vessels, performed or made in any other manner, should be valid or authentic. (2 *Idem*, 435, § 6.)   The provisions of this section

were incorporated into the eighth section of the act of 1784, on the same subject. (1 *Greenl. Laws*, 89.) And these several powers to the master and wardens, as surveyors, were continued in the several revisions previous to the act of 1819. But in that act the words "shall be surveyors of all damaged goods brought into the said port of New-York, in any ship or vessel," which were contained in the 308th section of the revised act of 1813, (2 *R. L. of* 1813, *p.* 459,) were left out. In other words, so much of the previous statutory provisions on the subject of surveys as declared that the master and wardens of the port of New-York should be ex officio surveyors of all damaged goods brought into that port in any ship or vessel, was repealed by the legislature after it had been in force about sixty years. Whether this repeal was intentional, or merely accidental, it is not material now to inquire. It is sufficient to say that the complainants are no longer ex officio surveyors of damaged goods imported into the city of New-York, except in the cases specified in the fifth section of the act of 1819. That is, when such damaged goods are required to be sold by the owner or consignee, on account of such damage, and for the benefit of underwriters who do not reside in New-York. The statute does not prohibit the master and wardens from acting as surveyors in cases not mentioned in the act of 1819 ; and it was therefore very proper to have a tariff of fees which should apply to other surveys in case they should be made, by such master and wardens, as had theretofore been done. But the granting of a fixed rate of fees for particular services, does not, even by implication, give the complainants the exclusive right to perform such services, or interfere with the right of others to perform similar services, for such persons as may think fit to employ them.

The order appealed from must therefore be modified so as to limit its operation to the cases in which the complainants are expressly authorized to act as surveyors, judges of repairs, or in superintending sales, or in giving certificates, by the fifth section of the act of February, 1819. And neither party is to have costs against the other on this appeal.

The objection that the suit should have been in the artificial

Tyack *v.* Brumley.

name in which the complainants are authorized to sue for their fees, is not well taken. The injury complained of is an injury to the complainants as individuals having a joint and common interest; and the suit was therefore properly brought in their own names.(*a*)

(*a*) Upon the argument of this case, the counsel for the appellants referred to a decision made by the Hon. Samuel R. Betts, in the district court of the United States for the southern district of New-York, on the 10th of September, 1844, in the case of *Wight and others* v. *Curtis,* in which some of the questions above discussed by the chancellor, were very ably examined by Judge Betts. The following is the opinion delivered by his Honor in the case referred to :

S. R. BETTS, *Judge.* In the decision of this case, I shall forbear the review of several topics discussed with great fulness and learning on the hearing. Under the construction I give the 52d section of the act of 1799, it does not become necessary to consider the origin of the powers of the port wardens of this port, or the just extent of those powers under the statutes of the state, or the conveniency or fitness of the usage, prevailing with the custom house here, to call for their official certificates in cases of goods damaged on the voyage of importation, for which a deduction of duties shall be claimed, nor to investigate and determine the right of marine surveyors, under private appointment, to perform that service.

The facts presenting the question in contestation between the parties, are, that the ship Sheffield, when coming into this port, in November last, and in charge of a pilot, grounded in a heavy wind and filled and sank. She was subsequently raised and towed to the city, and her cargo unladen ; and by consent and at the instance of all parties interested, it was ordered by the collector to be deposited in a public store house. The dutiable goods of the plaintiffs on board the ship, were damaged by sea water on the occasion, to the amount of 60 per cent. on the value. The plaintiffs produced certificates of the port wardens of surveys of all their packages except one, and asked and had allowed them by the collector, an appraisement of the damages so incurred by those packages. In respect to the package in question, the plaintiffs offered to the collector the sworn survey and appraisement of Alexander Cartwright, (representing himself to be a person "selected by the parties interested,) to survey, appraise, arbitrate and judge of vessels and goods arriving damaged, or becoming damaged in the port of New-York," certifying that he had taken a strict and careful survey of the goods in question, and found them to have been damaged on the voyage of importation. Also the deposition, of the master of the ship, proving the wreck and injury to the cargo in consequence. An exception was taken on the argument, to the admissibility of this deposition, because the attestation was taken before a state magistrate, not authorized to administer oaths to be used in the United States tribunals. I think this objection cannot prevail, for the attestation on oath, to such a document, is not required by any act of congress ; and if it was, the collector should have put his refusal to receive the affidavit, upon the ground of the defect of au-

Tyack *v.* Brumley.

thority in the officer taking the oath, so that the irregularity might have been rectified at the time, and he would not be permitted to start the objection on the final argument. His acceptation of the deposition will be deemed a waiver of any informality in the jurat, particularly as the paper was addressed to him, and was to have no other operation than to guide his decision on the claim of the importer to have his goods appraised.

The collector, by his letter of Nov. 23, 1843, to the plaintiffs, stated that according to the instructions which he had received from the secretary of the treasury, the certificate of damage must be given by a port warden, and added : "that if within ten days after the landing of the goods, such certificate shall be presented, orders will be given for an appraisement." The particular certificate not being furnished, the appraisement was refused and the plaintiffs paid the full duties charged, $103,14 on this package, making their protest at the time ; and then brought this action in a state court, to recover back 60 per cent. thereof, being $67,05, with interest from Nov. 25, 1843. The action was removed to this court pursuant to the act of congress of March 2, 1833. A letter of the secretary of the treasury, dated July 13, 1843, to the collector, ratified his decision in a previous case, rejecting the certificate of damage given by the marine surveyors appointed by the chamber of commerce and board of underwriters of the port of New-York, and approved the practice of requiring the certificate of damage to be given by the port wardens ; as being not only in accordance with the 52d section of the act of 1799, but as that which most nearly conforms with its provisions.

Some criticism was made, upon the argument, as to the proofs of damage : and their sufficiency to establish the fact, was questioned. But as the objection on the trial referred essentially to their admissibility, and the fact and extent of damage was not made a prominent point, I shall regard the testimony, if competent, sufficient to have justified the jury in finding for the plaintiffs. And the court, on a case made, will draw the same inferences from the evidence a jury would be warranted in drawing. (14 *Johns.* 215, 216. 15 *Id.* 409, 6 *Cowen,* 632.) It was also suggested, that the collector rightfully refused the request of the plaintiffs, because they asked the appointment of merchant appraisers, conformably to the act of 1799, when the act of 1823 had abolished that mode of appraisement, and designated official appraisers who alone possessed authority to make the appraisement. This was clearly a mere misapprehension in the form of application, a mistake which the collector does not regard, for he avowed his readiness to act under the application, on being furnished the particular certificate he required ; and accordingly the error of the plaintiffs in the designation of the appraising officers can stand in no way against the rights in the matter. The court will regard it as the collector did, a request to have the appraisement made conformably to the law. The essential question to be disposed of, is then, whether the plaintiffs, on the facts and circumstances of this case, were bound to produce a certificate of the port wardens, before the appraisement and a deduction of duties because of such damages could be claimed by them.

This inquiry turns upon the construction to be given *to* the 52d section of the act of March 2, 1799. It enacts that "all goods, wares and merchandize of which entry shall be made incomplete, or without the specification of particulars, either for want of the original invoice or invoices, or for any other cause, or which shall have received

Tyack *v.* Brumley.

damage during the voyage, to be ascertained by the *proper officers* of the port or dis-
trict in which the said goods, wares or merchandize shall arrive, shall be con-
veyed to some warehouse or storehouse to be designated by the collector, in the par-
cels or packages containing the same, there to remain with due and reasonable care,
at the expense and risk of the owner or consignee, under the care of some *proper
officer* until the particulars, cost or value, as the case may require, shall have been
ascertained, either by the exhibition of the original invoice or invoices thereof, or by
appraisement at the option of the owner, importer or consignee, in manner hereafter
provided, and until the duties thereon shall have been paid or secured to be paid,
and a permit granted by the collector for the delivery thereof. And for the appraise-
ment of goods, wares and merchandize not accompanied with the original invoice of
their cost, or to ascertain the damage thereon received during the voyage, it shall be
lawful for the collector, and upon request of the party he is required, to appoint one
merchant, and the owner, importer or consignee to appoint another, who shall ap-
praise or value the said goods, wares or merchandize accordingly : which appraise-
ment shall be subscribed by the parties making the same, and be verified on oath or
affirmation before the said collector : which oath or affirmation shall be in the form
following, to wit, &c.   The usage at the custom house under this section, has always
been to exact a certificate preliminary to ordering an appraisement on damaged
goods, and the wardens of the port have been held the "proper officers" to give said
certificate.

On the part of the plaintiffs, it is contended that the act contains no authority for
either of these requirements.  The section recited, directs goods, wares and mer-
chandize to be conveyed to some warehouse or storehouse on arriving in port in
either of two conditions, (1) when the entry of these shall have been made incom-
plete for any cause, and (2) which shall have received damage during the voyage,
to be ascertained by the "proper officers," &c.   In the first instance, it is plain, the
collector acts on his own view of the state of the entry, and without any extraneous
evidence ; but as in the second instance, the cause for ordering the goods to a pub-
lic store could not be apparent in the entry, or one which the collector would be sup-
posed prepared to decide on his own inspection, there would seem to be the occasion
for designating by law the circumstances which would require or authorize the order.
This designation is supposed to be supplied by the statute.  The terms of the act
may probably admit this construction, and if the first clause is read by itself, such
might be its more natural interpretation, because the inquiry which is to lead to the
action of the collector, is whether the goods have received damage during the voy-
age, and the expression "to be ascertained by the proper officers," might well be
regarded as having reference to the general proposition or idea of "damage during
the voyage," and not to damage simply in respect to its amount or extent.  But the
same expression is taken up in the subsequent clause of the section, and congress,
by the application of it there, would seem to regard the language as calling for a
valuation of damages, and not merely the finding the fact that damage had been
received.  This understanding of its import, is again distinctly indicated in the form
of the oath, for the appraisers are required to swear that "the packages have received
damage, as we believe, during the voyage of importation, and that the allowance by

Tyack *v.* Brumley.

us made, for such damage, is to the best of our skill and judgment-just." It is not to be supposed that congress would in this clause and in the oath impose on appraisers the duty of ascertaining the fact of damage during the voyage, if, by the previous clause, other officers were appointed to perform that very service; and it seems to me that the entire section, taken with the form of the oath, denotes that it was intended to provide for no more than one ascertainment of damage in this behalf, and that in this respect, the first clause in the section is to be considered subordinate to, or more completely fulfilled by the subsequent one. Although the language may be susceptible, and most naturally, of the interpretation given it by the collector and the secretary of the treasury, yet plainly no violence is done it by understanding it in the other sense, and the latter would most effectually harmonize all the provisions of the section. In aid of this exposition, it is to be observed that the language is prospective, having relation to an act afterwards to be done, and that not necessarily before the action of the collector in ordering the goods to a public store. "Damage to be ascertained," and "to ascertain the damage," are correlative expressions, and indicate one and the same procedure; and that they are so used by congress, is plainly imported by the terms of the oath " to ascertain and appraise the damage." This latter act must necessarily follow the deposite of the goods in a public store, and the language of the first clause may very well be satisfied, even on the interpretation of the defendant, by having the survey posterior to the deposite in store. If then this ascertainment of damages by proper officers, must not indispensably be had, previous to the deposite of the goods, and as the statute provides for only one proceeding thereon subsequent to such deposite, the entire section would most appropriately be read as having reference to the one act of ascertaining and appraising, designated and directed in the latter clauses. I think, therefore, that upon the true construction of the 52d section "the damage received during the voyage, to be ascertained by the proper officers of the port or district," mentioned in the first clause, is the same matter directed to be inquired into and determined in the after branch of the section, and that accordingly there is no authority in the act for requiring any other survey or appraisement.

A more minute analysis of the terms of the section will conduce to the support of this construction. If the provisions of the first clause call for a survey of the goods by proper officers, as it is understood at the custom house, it stands in singular contrast with the after provision in that respect, in not naming the officers who are to perform the duty, in not exacting the sanction of an oath from them, and in not rendering it obligatory on the collector to take the proceedings. The importer is supplied with no authority to compel the action of the collector, and if the first branch of the section is read as complete within itself, it would seem that the merchant is placed entirely at the discretion of the collector, or can have no relief because of the deterioration of his property, unless through the tedious and precarious prosecution of the collector for malfeasance in his office. Congress deemed the matter worthy precise legislation, when they came to consider the equitable consequences of such injury to goods, on the rights of the importer and the interests of the revenue, and provided specifically for enforcing and preserving these respective interests. Such incongruity would be reluctantly implied in the provisions of the same section, and the construction, therefore, which regards the whole subject matter as one and the

---

Tyack *v.* Brumley.

---

same, and as provided for in a common regulation, seems best adapted to uphold the rights of all parties, and fulfil the obvious purpose of congress.  This same course is pursued in the sixtieth section in relation to vessels coming into port in distress. The regulation is minute and specific as to terms and manner in which kindred services are to be obtained and rendered, and whether state officers or merchant as-sessors are employed, the act points out definitively when and how they are to act. This latter *section* supplies also 'a forcible argument against the application of the term " proper officers," used in the fifty-second section, to port wardens, because the 60th section names them, and if there are no port wardens it calls for other state officers usually charged with and accustomed to ascertain the condition of ships or vessels arriving in distress.

It is not to be supposed if congress adopted, in the previous section, " port war-dens," under the general appellation of " proper officers," as well known to possess and exercise within the states the functions there called for, that in legislating fur-ther on like subject matters, they would, in the sixtieth section, name them specifi-cally, or describe the qualifications of the other officers who might be used.  But it is to be remarked that the term " proper officers," is twice used in the same para-graph of the fifty-second section, and in the latter case must necessarily refer to some custom house officer, or one appointed under the authority of the revenue laws, because he is officially to take care of the goods ordered by the collector to be placed in store.  It is not unworthy of observation that the phrase " proper officers" of the port or district in which the goods, &c. shall arrive does not apply to any public officers known to the laws of this state at the time the act of congress was passed, nor is it probable that such officers were created in any of the other states.  The powers of port wardens do not, under the colonial or state statutes, extend beyond the port of New-York ; (*Act March* 7, 1759, 2 *Smith & Livingston*, 160 ; *Act* 14th *April*, 1784, 1 *Greenl.* 86 ;) whereas the district of New-York was by the fifth section of the act of congress of March 2, 1799, (as it had been by the act of July 31, 1789,) made to embrace nearly all the coasts, rivers, bays and harbors of the part of the state, including those of the North river.  The city of New-York is, in the act of 1789, and all subsequent ones, made the port of entry ; but it is manifest that there must be officers created under the acts, whose powers extend over the entire district.  It may be as important to have proper officers of the revenue in other harbors on the coast within the district to take care of goods deposited there by the collector, as in that of New-York.  And it may become of equal importance to have appraisements made at such places ; because the whole regulation has reference to wrecks or disasters at sea, and will necessarily be ample enough to meet the exigen-cies that are likely to arise in this behalf in every port of the district.

Again, the argument in favor of construing the fifty-second section so as to have the expressions " proper officers of the port or district" apply to port wardens, rests upon the assumption that that class of officers notoriously possessed and exercised, under the state laws of the different states, the power of making surveys of goods alleged to be damaged on the voyage of importation, and determining the fact whether such damage had been received.  There may be ground to doubt the entire correctness of this assumption.  By the colonial act of March 7, 1759, § 9, the master

Tyack v. Brumley.

and wardens of the port of New-York, for the time being, are appointed surveyors, for surveying all damaged goods brought into the said port in any ship or vessel, and in like manner, with the assistance of one or more able carpenters, to survey all vessels deemed unfit to proceed to sea, &c.   (2 *Smith & Liv. Laws*, 163.)   An act was passed September 11th, 1761, with a preamble that, "whereas goods imported here, and insured in Great Britain and elsewhere abroad, are sometimes sold in this city for the account of the insurers, and some persons taking the advantage of their absence, have frequently made fraudulent sales, to the great prejudice of the insurers, the undue gain of the assured, and detriment of the commerce of this colony ; for a remedy, therefore, it is enacted that, hereafter, all damaged goods to be sold for account of the insurers, shall be surveyed by the master or one or more of the wardens of the port of New-York for the time being, and such sale shall be made in his or their presence," &c.   (*Van Schaick's ed. Laws N. Y.* 394.)   This act was continued in force to January 1, 1775.   (*Idem*, 498.)   If this act is to be regarded as suspending or superseding that of 1759, during its continuance or its expiration, the latter probably revived, and under the thirty-fifth article of the constitution of April 20, 1777, continued in force until the passage of the act of April, 1784, by the state legislature.   The eighth section of the latter act is a re-enactment of the ninth section of the act of 1759.   (*Jones & Varick, Laws N. Y.* 122.   1 *Greenl.* 89 )   The latter law, in substance, was continued under the various revisions of the statutes, till a revision and consolidation of the laws on this subject by the act of February 19, 1819.   (5 *Laws N. Y.* 11.)   By the fifth section, it is enacted that the master and wardens of the port of New-York, or any two of them, with the assistance of one or more skilful carpenters, shall be surveyors of any vessel deemed unfit to proceed to sea, &c. and in all cases of vessels and goods arriving damaged, and by the owner or consignee required to be sold at public auction, on account of such damage, and for the benefit of underwriters out of the city of New-York.   Such sale shall be made under the inspection of the master and wardens, or some or one of them, which master and wardens shall, when required by the owner or consignee aforesaid, certify the cause of such damage, &c. and an after clause gives them $1,50 for each and every survey on board of any ship or vessel, or at any store or along the docks of the city of New-York, on damaged goods, &c.   This is, in substance, a re-enactment of the provisions of the colonial law of 1761, and the language of the section clearly indicates it was based upon like reasons: and as the existing laws of 1784, must necessarily have been in view of the legislature, the implication is strong, if not conclusive, that the latter act was introduced to limit the authority of port wardens in making surveys of damaged goods to the single case therein designated.

I am aware the vice chancellor in this circuit has put a different construction upon the act of 1819, and has held, from the grant of fees for surveys on damaged goods, that the intention of the legislature to make the powers of port wardens the same as they had been under the act of 1784, is to be implied.   This decision it is understood is in course of review before the chancellor ; and it is not, therefore, to be regarded as authoritative on the point.   And, with great respect for the learning and judgment of the distinguished judge who pronounced the opinion referred to, I

think it must be, at least, matter of doubt, whether so important an interpretation to the act of 1819, can be authorized, upon the presumption afforded by the mere grant of fees ; inasmuch as that provision may be reasonably satisfied by applying it to the particular surveys designated by the section. It is enough, however, in the case before me, to say that it is not made clear, by the laws of the state, that the port wardens are now possessed of authority to make surveys on all damaged goods brought into this port in any vessel, and certify the cause of such damage, and that accordingly, if congress intended to refer this service to state officers, the defendant fails to show that port wardens are " the proper officers of the port or district" competent to perform such services. But it is to be furthermore observed, that on the construction of the fifty-second section contended for by the defendant, a preliminary survey and certificate by port wardens can only be necessary for the purpose of guiding his discretion in ordering the goods to be deposited in a warehouse or storehouse. It is not urged that the port wardens have any authority to ascertain and appraise the damage ; and there is nothing in the section importing that after the collector, for either cause indicated therein, has commanded the deposite of goods, that he can do less or more respecting them than pursue the precise directions of the act. The act is express and explicit in declaring that when the condition exists requiring the goods to be conveyed to a warehouse or storehouse, they shall remain there until the particulars, &c. shall have been ascertained in the manner afterwards provided in the same section.

It seems to me clear, therefore, that if the collector might under the act exact the certificate of a proper officer, on survey of the goods, before he would order their deposit in public store, because of damage incurred on the voyage of importation, yet that if he act upon the assumption of such damage, and orders the deposite for that cause, he is then bound to proceed and have the damage ascertained and appraised by the public appraisers, who by the act of 1823, supersede in this behalf the authority of merchant appraisers referred to in the fifty-second section. I am, accordingly, of opinion that the plaintiffs are entitled to judgment on the verdict.