GEORGE W. GORDON & *al. versus* AARON D. LOWELL & *al.*

When a man can readily remove difficulties standing in the way of his pre-
vailing in a suit in equity, and does not do it, such difficulties become in-
surmountable.

Although the statutes provide, that any person, who should knowingly aid or
assist in any attempt by a debtor to conceal his property from his creditors,
should be liable to any creditor defrauded in a penalty, and that he should
also be subject to be punished criminally ; yet a court of equity will not
aid in the infliction of penalties, but will endeavor that strict justice shall
govern in the transactions between individuals.

A court of equity will assist a judgment creditor to discover and reach the
property of his debtor, who has no property that can be reached by an ex-
ecution at law, and especially when it is attempted fraudulently to secrete
it.

When a creditor has, through the instrumentality of a court of equity, sought
out and discovered the property of his debtor, which he had before been
unable to discover and seise upon execution at law, he becomes entitled to
a preference over other creditors, to have his judgment first satisfied, even
under the insolvent laws.

THIS was a bill in equity, and came before the Court on bill,
answers, and proof. The substance is given in the opinion of
the Court.

This case was argued, it is said, at the May Term, 1841,
when the present Reporter was not in office ; and was again
argued at the May Term, 1842, by *F. Allen*, for the plaintiffs,
and by *J. Rand*, for the defendants.

*Allen*, cited *Buck* v. *Pike*, 2 Fairf. 9 ; *Conner* v. *Lewis*,
16 Maine R. 275 ; *Gardiner Bank* v. *Wheaton*, 8 Greenl.
373 ; *Powell* v. *Mon. & Br. Man. Co.* 3 Mason, 347 ; *Jew-
ett* v. *Palmer*, 7 Johns. C. R. 65.

*Rand* contended, that the answers explicitly denied every
material allegation in the bill, and that there was no sufficient
proof in the case to contradict and destroy the effect of the
answers.

The opinion of the Court, on June 3, 1843, was delivered
by

WHITMAN C. J. — The bill sets forth, that, in 1835 and
1836, the defendant, Lowell, resided in Bangor ; and did an

extensive business there as a dealer in merchandize; and, in the time, became indebted to the plaintiffs to a large amount; that in October, 1839, they obtained judgment against him, on account thereof, for $3965 debt, and $9,54, costs of suit; on which execution was issued, and returned unsatisfied, there being no visible property of said Lowell whereon to levy it; that said Lowell ceased to do business, as a trader, in 1836; and, to defraud the plaintiffs and his other creditors, that he ceased to be the ostensible owner of any property, although he had sustained no losses; and yet in fact was the beneficial owner of property to a large amount; and, early in 1837, removed to the town of China; and there became possessed of a farm of the value of $4000; and had ever since continued to hold, occupy and enjoy the same; that he procured a conveyance of the same to be made to his father-in-law, the defendant, Tukey, in trust for the benefit of him the said Lowell, who paid the consideration for the same; therein combining with the said Tukey to defraud the plaintiffs, and the other creditors of him the said Lowell, by causing the said Tukey to be the ostensible owner, when he himself was secretly the beneficial owner; that subsequently, in April, 1839, the said Lowell confederating with the said Tukey, and also with the defendants, Shaw and Lincoln, in furtherance of the said fraudulent intent, procured the same farm to be conveyed by the said Tukey, for the pretended consideration of $2500, to them the said Shaw and Lincoln, to be by them held secretly for his use and benefit.

To the bill the defendants have put in their several answers, denying all fraud and collusion. Shaw and Lincoln declare, that they were *bona fide* purchasers, and had no knowledge but that Tukey was the *bona fide*, as well as the ostensible owner of the farm, when they purchased it of him. And the evidence, though strongly presumptive against their innocence, is not deemed entirely sufficient to outweigh their declarations under oath, in their answers, to the contrary; especially, not so that a Court would be authorized wholly to disbelieve them.

With respect to the other defendants, Lowell and Tukey, the aspect of the case cannot be regarded otherwise than as strongly unfavorable to a conclusion that no sinister design existed between them. The evidence against them, though circumstantial, is such as cannot fairly leave a reasonable doubt that there was collusion in their negotiations in reference to the purchase of the farm. Their answers, under oath, so far as they are responsive to the bill, in the absence of evidence to the contrary, are to be taken as conclusive. But if circumstances be proved, by credible and disinterested witnesses, utterly irreconcilable with the truth of their statements, we must come to the conclusion that their statements are not entitled to our credence.

In the first place, it must be regarded as undeniable, that the sum of twenty-eight hundred dollars and over was paid by Tukey, by the hands of Lowell, or by Lowell for himself, between sometime in September, 1836, and the first of February, 1837, for the farm in China. Lowell, in his answer, does not say directly, that he had the money of Tukey. He only denies that he "advanced the money, or furnished the security for the consideration of said purchase;" or that the consideration, expressed in said conveyances and assignments, was "paid out of his own money." He nowhere says directly, that he received the same from Tukey. He undoubtedly means that it should be so inferred by the Court, from his other statements; and if it were proper in the present case, and under the allegations in the bill, explicitly stating the fact to be otherwise, for us to infer, that he did so receive it, without an express affirmation on his part, that such was the fact, we might feel ourselves authorized to make the inference. It is certainly a very material fact to be established; and must have been seen by him to be so. Should it then have been left to be inferred merely? We cannot but think, if Tukey ever furnished him with the money, that this allegation should have been direct and explicit to that effect; at the same time circumstantially setting forth the times when, the manner in which, and in what parcels, and under what circumstances he

received it, referring to documents evidencing the payments. It is surely not reasonable that we should believe, that such an amount of money was paid by Tukey to Lowell, the one living in Portland, and the other in Bangor, to buy a farm of such value, without some written evidence of the transaction. Yet nothing of the kind is alluded to as ever having existed.

Tukey's answer is equally barren of any such detail. He contents himself with merely saying, that he paid to the said Shaw and Garland, out of his own money, in consideration of this conveyance, two thousand eight hundred and ten dollars and forty nine-cents. That he did this by his agent, Lowell, who was duly authorized for the purpose. How was he duly authorized? No authorization is exhibited. Was it by letter, power of attorney, or verbally? He says furthermore, that this purchase was in execution of "a purpose or intention, long before formed by him, of spending his remaining years upon a farm." This farm, so purchased, and in execution of a purpose long before formed, of spending the remainder of his days upon, went immediately into the possession of Lowell, who occupied it precisely as if it had been his own, till April, 1839; when he sold it, as both of these defendants say, as agent for Tukey, to the defendants, Shaw and Lincoln. Tukey never saw it, either before the purchase or afterwards. Lowell, while so occupying it, built thereon an expensive barn, supposed to have cost at least four hundred dollars, besides making other improvements. It is not even pretended that this was done with money furnished by Tukey, or at his expense; or that any account was kept or charge made to Tukey for it. How does all this comport with the pretence that this farm was purchased for Tukey, or with Tukey's money, in pursuance of a design long since formed by him of spending the remnant of his days upon it? A farm he had never seen before the purchase! A farm while it stood apparently his, he never went to see; and which was sold without his ever seeing it!

His excuse for never going upon it, and for his final conclusion to sell it, is, that his health and strength, by reason of

long continued sickness, had become much impaired ; and his ability to occupy, manage and carry it on, thereby seriously affected. As to this, the evidence, aside from his answer, is incontrovertible, that he, being by trade a mason, for years before the purchase of this farm, had been rendered unable to labor, by reason of a rupture ; and had, in several years, claimed to have his poll taxes abated, which had been granted, on account of his inability to labor. There is no testimony, aside from his own declaration, that his infirmity had increased upon him in the years that the title to the farm stood in his name. If such a fact had existed, it must be believed that he would and could easily have proved it. It could not have happened without the knowledge of those in daily habits of intercourse with him.

Again ; where, how, and when did he become able, in the short space of from some time in September, 1836, to the last of Jan'y, 1837, to obtain the sum of twenty-eight hundred and ten dollars, with which to pay for this farm ? William Lord, who had been collector of taxes for ten years next prior to the time of giving his testimony, says, that if Tukey had been at any time during the five years next preceding, possessed of any personal property, his acquaintance with him and his affairs was such, that he thinks he should have known it ; that during that time he had not been taxed for any, and he had no knowledge of his having any ; that he had been unable, in any of those years, to obtain the payment of his taxes, all at one time, and he had invariably complained of being unable to get money wherewith to pay them.

Charles Fox, who had for twenty years, been one of the assessors of Portland, testifies to nearly the same effect. Tukey or his attorney or both were present at the taking of this testimony ; yet not the slightest effort has been made to prove that he had any personal property whatever, or that he had in any way, raised the amount by borrowing, or by the sale of real estate, wherewith to pay for the farm. Did he own navigation, did he own stocks of any kind, had he debts due to him, how easy must it have been for him to have proved such fact ? He

could but have seen that the stress of the case depended much upon obviating the force of this testimony. And where a man can readily remove difficulties, standing in the way of his prevailing in a suit at law, and does not do it, such difficulties become insurmountable. His unquestioned infirmities, with a family to support, with his continual complaints of inability to raise money to pay his taxes, the supposition, that he could, by his earnings or savings, have accumulated, and secretly have hoarded up the sum of twenty-eight hundred and ten dollars, without being able to make the slightest proof of it, to be suddenly placed in the hands of any one, however responsible, and much less in the hands of a son-in-law, who had just failed in business, living one hundred and thirty miles from him, to purchase for him a farm to retire upon, without previously seeing and examining it for his own satisfaction, cannot for a moment be entertained.

It moreover appears, that after the sale of the farm to Shaw and Lincoln, a claim was made upon it, on account of a prior incumbrance, which was adjusted by Shaw and Lincoln, with the concurrence of Lowell, and the sum of three hundred and seventy dollars was paid to discharge it. Have Shaw and Lincoln ever called upon Tukey for a reimbursement of the amount so paid? Have they pocketed the loss, and called upon no one for it? This can scarcely be believed, if the sale to them was *bona fide*, as is averred by all the defendants. It is but reasonable to conclude, and it can scarcely be doubted, that Lowell must have borne this loss out of his own funds.

Such a train of circumstances, so directly conflicting with the statements in the answers of the defendants, Lowell and Tukey, prove incontestably, and to our entire satisfaction, that the funds to purchase the farm must have come from Lowell himself; and that whether they were his own or not, he could not have derived them from Tukey; and that the transaction was in furtherance of a combination and confederacy between these defendants to defraud the plaintiffs, and the other creditors of the said Lowell, of their just debts.

The Legislature of this State, in 1835, by an act c. 195,

§ 13, provided, that any person who should knowingly aid or assist in any attempt, by a debtor, to conceal his property from his creditors, should be liable, in an action of the case, to any creditor, who might sue for the same, to double the value of the property concealed, not exceeding, however, double the amount of the debt due to such creditor.   The same provision has been re-enacted into the Revised Statutes; with an addition, making it punishable as a criminal offence.   We thus have an indication of the legislative sense of the enormity of such transactions.   A court of equity, however, does not aid in the infliction of penalties; but endeavors that strict justice shall govern in the transactions between individuals.

It is undoubtedly a well settled principle, that a court of chancery should assist a judgment creditor to discover and reach the property of his debtor, who has no property that can be reached by an execution at law; *Hadden* v. *Spader*, 20 Johns. 554 ; and especially under the chancery powers of this Court when it is attempted fraudulently to secrete it. It is also a well established principle, when a creditor has, through the instrumentality of a court of equity, sought out and discovered the property of his debtor, which he had before been unable to discover and seise upon execution at law, that he becomes entitled to a preference over other creditors, to have his judgment first satisfied, even under the insolvent laws. *McDermutt & al.* v. *Strong & al.* 4 Johns. C. R. 687.

It appears by the admissions of Tukey, that, on the 24th of April, 1839, he received ample security for the payment of twenty-five hundred dollars, being the proceeds of the sale of the farm, purchased in the manner aforesaid, which sum we must regard as actually in his hands, of the property of said Lowell, and by him the said Tukey intended to be concealed from the plaintiffs, and the other creditors of the said Lowell. We, therefore, order and decree, that judgment be entered up, that the plaintiffs recover of the said Tukey, in part satisfaction of their judgment against said Lowell, the said sum of twenty-five hundred dollars, with interest thereon from the said 24th of April, 1839 ; and that a separate judgment be entered

up against the said Tukey and Lowell, and in favor of the plaintiffs, for their costs of this prosecution. And that the bill, as to Shaw and Lincoln, be dismissed without costs for them.