## LEWIS *a.* OLIVER.

*Brooklyn City Court, January,* 1857.

BROOKLYN CHARTER.—RESIGNATIONS AND ELECTIONS OF ALDER-
MEN.—INJUNCTION AGAINST MUNICIPAL OFFICER.—ACTION IN
NATURE OF QUO WARRANTO.

Of the manner in which an alderman of the city of Brooklyn may, under the con-
solidated charter, resign his office.

How a vacant seat in the Board of Aldermen, of the city of Brooklyn, is to be
filled.

An injunction will not lie at the suit of a freeholder and tax-payer of a municipal
corporation to enjoin a person about to act as alderman and to vote upon ques-
tions affecting the property of plaintiff, although he is without any lawful au-
thority so to do.

An injunction can only be granted upon showing that defendant is about to do
some specific act in violation of plaintiff's rights.

An action in the nature of a *quo warranto,* is the proper remedy where an unau-
thorized person has usurped the office of aldermen in a municipal corporation.

Motion for a perpetual injunction.

This was an injunction suit brought by W. Lewis, E. T. Back-
house, and others, against Joseph Oliver and the Common Coun-
cil of the city of Brooklyn. The facts on which the suit was
based, are stated in the opinion of the court. On the complaint,
a temporary injunction was granted, which plaintiffs now sought
to have made perpetual.

CULVER, J.—The plaintiffs, who represent themselves as free-
holders and tax-payers of the city of Brooklyn, ask an injunction
restraining the defendant Oliver from taking his seat and act-
ing as an alderman of the Ninth Ward, and enjoining the Com-
mon Council from recognizing him as such; on the ground that
he was not legally elected. They allege there was no vacancy
to be filled at the time he professes to have been elected.

The facts alleged in the complaint, upon which the preliminary
injunction was granted, have, to some extent, been modified by
the answer and the accompanying affidavits. The complaint
avers that Mills, to fill whose place Oliver claims to have been
elected, stated to the Board that he resigned his office, but that

no written notice was ever given to the city clerk, or published in the Corporation papers.

The answer, on the other hand, avers that on October 6, 1856, Mills presented in writing to the Mayor and Common Council his resignation, to take effect on January 1, 1857, that it was accepted and filed, and the clerk ordered to make the necessary publication, and that the Board ordered a special election to fill the vacancy. The answer further alleges that the resignation was filed with the clerk, not of the city, but of the Common Council, and that the "*fact*" (not a copy of the notice) of such resignation was published among the proceedings of the Common Council; and that a notice of the special election was published. A copy of this notice is annexed to the answer. It bears date October 23, 1856, and purports to notify, by order of Common Council, a special election for November 4, to fill the vacancy of Mills, whose resignation would take effect on January 1, 1857. The answer then avers that an election was held on November 4, and Oliver elected; that he took the oath of office, and on the first Monday of January took his seat and acted with the Common Council.

It will be observed that the complaint avers that no written notice of Mills' resignation was served on the city clerk, or published in the Corporation papers, and that Mills continued to act after January 1, 1857. These averments are not denied in the answer. I shall, therefore, assume them as true, and in deciding this motion, I shall take the averments in the answer, being stated more in detail, and with a better acquaintance with the facts, as the correct history of the transaction.

Two questions naturally arise in coming to a just decision of this motion.

1. Was the defendant Oliver elected as required by law, so as to entitle him to fill the vacancy of Mills? If not,

2. Have the plaintiffs taken the proper remedy to prevent him from holding the office?

In determining the first question, reference must be had to the resignation of Mills and the attendant circumstances.

The law has taken care to provide, not only how men may be elected and inducted into office, but also how they may retire from and vacate their office, and, so far as the public and the officer are concerned, it is equally important that he resigns the

office in the form and manner required by law, as that he enters upon its duties in such manner.

Mills, the predecessor of Oliver, was elected in 1855, for two years. His regular full term would have expired on the first Monday in January, 1858; and no one could be elected to take his place till November, 1857, unless he legally vacated the office before that time.

Has he done that? In other words, did Mills resign the office as required by law?

By section 6 of title 2 of the consolidated charter (*Laws of* 1854, 838, *ch.* 384), an alderman to resign office, must do so "by filing written notice thereof *with the city clerk,* AND by publishing a COPY of *such notice* in the Corporation newspapers. Mills complied, strictly speaking, with neither of these requirements. He simply sent a communication to the Mayor and Common Council tendering his resignation. He did not file it with or deliver it to the city clerk. Much less did he even pretend to comply with the other equally indispensable requirement, the publishing a "copy of such notice in the Corporation newspapers." Till he had done both of these acts, his resignation could not take effect. He has done neither.

Another and a subsequent provision in the same charter, guards with even greater care the manner of resigning office. By section 30 of title 3 (*Laws of* 1854, 859), it is provided that "any officer elected under this Act, may resign his office by giving notice in writing of his intention, to the city clerk, and publishing a copy of such notice in the Corporation newspapers." No other way is hinted at in the charter to resign the office. Till the notice is given to the city clerk, the Common Council cannot be properly informed of the vacancy; and until it is published, the voters are not presumed to be notified of what has been done. It cannot, I think, therefore, for a moment be pretended that alderman Mills complied with the terms of the statute. Publishing the "fact of his resignation" with the proceedings of the Common Council, was not "publishing a copy of his notice." And it is only by doing the latter, that the statute provides for his resignation at all.

But there is another, and, to me, it seems, a fatal defect in the resignation, and the action of the Common Council thereon. The answer sets forth, in full, the action of that body touching

the resignation. And the defect is, that the Common Council appointed no day for the special election. True, the answer avers that the clerk published a notice (and sets forth a copy) that an election to fill the vacancy would be held on November 4, 1856.

But the clerk had no more authority to designate the day than the clerk of the Supreme Court; nor had he any more right to designate the fourth, than the third or fifth of November. His business is to record the acts of the Common Council, and not to fix the time of holding elections.

The Common Council, and they alone, could fix the *time* and place of the election, and when so fixed, the clerk could record and publish their doings and give the proper notice of the fact. Till this had been done, the electors of the ward had no right to presume that the vacancy could be legally filled, or the day named. It is the Common Council, and not the clerk, that are empowered by the charter to order the special election. In this respect, therefore, the proceedings were fatally defective.

But, again, Mills (so says the answer) tendered his resignation to take effect January 1, 1857. What became of the office in the interim? Was it vacant or filled? If not vacant, how could it be filled? Was the resignation, when tendered, placed beyond the control of Mills? I think not. It was competent for him, at least in this case, to have recalled it at the next meeting, or on the first or second of January.

I am aware that the record shows, or the answer so alleges, that the resignation was accepted by the Common Council, but that was altogether a work of supererogation. It could in no way affect its validity. 'If Mills resigned in the manner required by the charter, the Common Council could not prevent it; if he did not, then their acceptance of his resignation could not render it legal. Indeed, as I understand the charter, the Common Council have nothing to do with the resignation. They are only to provide for filling the vacancy when informed by the city clerk that one legally exists.

In this case it would seem that Mills changed his own purpose, for he is found acting in his office on the second day of January, which was one day after the time prescribed by himself for the resignation to take effect.

It was urged, and not without some force on the argument,

that as the charter declares "the Common Council shall be the sole judges of the qualification of its own members" (*Laws of* 1854, 838, *ch.* 384, *tit.* 2, § 9), and that as they had recognized Oliver as a member, their action was conclusive in the premises. I have compared this provision in the charter with the ones supposed to be analogous, in the Federal and State Constitutions, touching the powers of Congress and the powers of the State Legislature, and I find the phraseology substantially different. In the former, it is provided that each House of Congress shall be "the sole judges of the elections, returns and qualifications of its own members." The phraseology of the State Constitution is precisely similar to that of the Federal, showing that the election and returns are one matter, and the qualifications an additional one.

It is only in relation to the last, and not the two former, that the statute allows the Common Council to be the "sole judge." There was a manifest propriety in clothing Congress and the Legislature with the prerogative of judging of all these, because they are themselves the supreme law-making power; while the Common Council is only the creature, of itself subordinate to the law-making power. This body, therefore, is only permitted to judge of the "qualifications" of its members. These are few, simple, and clearly defined in the statute.

But it cannot, surely, be pretended that this body is to be the sole judge of the election of its members, especially when such election may have been in violation of law. I am confirmed in this view of the matter from the fact, that suits in the nature of *quo warranto* have been brought to test the right of Aldermen to their seats.

I have come to the conclusion, therefore, that the election of the defendant, Joseph Oliver, cannot be sustained as legal, on the grounds,—

1. That the election at which he claims to have been chosen, was never ordered by the Common Council.

2. That there was no vacancy to fill. Mills never resigned as required by law, having neither given notice thereof to the city clerk, nor published a copy of the same in the corporation newspapers.

3. That the resignation was to take effect on a future day, and that after that day, he was found discharging the functions of the office.

The defendant is not, therefore, as between himself and the people, entitled to hold and discharge the duties of the office.

Another question arises in the case. Conceding that Oliver has not been duly elected to the office, have the plaintiffs taken the proper remedy to oust him from that office? Are they in a condition to ask, or have they showed a case entitling them to, the injunction prayed for in this complaint?

The writ of injunction, as a provisional remedy, has been abolished by the Code, and an injunction by *order* substituted (*Code*, § 218). This order can only be granted in some one of the cases allowed by the Code. And the plaintiffs claim that they bring their case within the spirit of that part of section 219 of the Code, that allows a temporary injunction when it appears the defendant is about to do some act which would produce injury to the plaintiff, or one in violation of his rights respecting the subject of the action, and tending to make the action ineffectual.

What is the act or acts which the plaintiffs charge that the defendant Oliver is about to do which will produce injury to them? It is (say they) that he is about to act as alderman, and to vote upon questions affecting their property without any lawful authority so to do. But they do not specify the act or the particular vote he is about to give, prejudicial to their rights. They only allege that he is about to vote and act generally with the Common Council. *Non constat* but he will vote and act in harmony with the rights and interests of the plaintiffs, and then surely they could not be aggrieved.

The people of the State might be aggrieved by his acting at all. It is a violation of their right for him to obtrude into, or exercise the functions of the office, if he has never been elected. The law has pointed out the way in which the people can redress the wrong, and call the obtruder to account.

But individuals, though they may be freeholders, householders, and tax-payers, as are the plaintiffs, cannot, and in this case do not, show that the general exercise of the functions of the officer will be so injurious to their private rights or interests, as to entitle them to the order of injunction.

I am aware there are many authorities, and several were cited on the argument by the plaintiff's counsel, showing that injunctions are often granted against public officers and municipal corporations, restraining them from the commission of certain acts.

Such injunctions are obtained on the prayer of individuals. Of this kind were the Broadway and other railroad cases in New-York. But a careful examination of these cases will show that in every instance the Corporation, or its individual members, were about to do some particular act prejudicial to the plaintiff's rights. And hence they were within the provisions of the Code, and could be sustained.

The Supreme Court, in the case of The People *v.* Cook (14 *Barb.*, 259), and which was affirmed in the Court of Appeals (4 *Seld.*, 67), held that the title of an officer to the office, whether judicial or ministerial, could not be inquired into collaterally, but must be by direct suit in the nature of a *quo warranto* in behalf of the people. As between the officer and the people, whose rights he has violated, his acts are wrong, and cannot be sustained, but, as to third persons, his acts, while an officer *de facto*, are valid, and cannot be collaterally impeached.

The plaintiffs in this action cannot, therefore, restrain the defendant, Joseph Oliver, or the Common Council, till they show that they are about to do, or threaten to do some particular act, in violation of their rights; and on a full examination of the case, I am satisfied this has not been shown.

The appropriate remedy is by action in the nature of *quo warranto*.

The motion to make the injunction perpetual must be denied with costs; the temporary injunction to be dissolved; and the defendant, Joseph Oliver, may, if he desires, have a reference to ascertain and report to the court what damages, if any, he has sustained in consequence of the issuing of the injunction.