JOSEPH PALYS

v.

HUGH J. JEWETT, receiver.

1. A person having a legal cause of action sounding merely in tort, against a receiver appointed by the court of chancery, has a right to pursue his redress by an action at law.

2. Such action cannot be brought without the permission of the chancellor, but such permission cannot be refused, unless the claim preferred be manifestly unfounded and vexatious.

3. The power of the chancellor in this respect considered.

NOTE.—No brief on the part of the respondent in this case was furnished the reporter.—REP.

Palys *v.* Jewett.

4. As the right of the chancellor to sanction the bringing of the action, conferred a *scintilla* of jurisdiction over the case, and the parties proceeded to try the cause before the vice-chancellor,—*Held*, that the court of appeals could lawfully exercise its jurisdiction by way of review, and, the decree being reversed, the complainant's damages were ascertained and adjudged to him on this appeal.

5. The facts discussed with respect to the question of contributory negligence.

On appeal from a decree of the vice-chancellor, reported in *Palys* v. *Erie Railway Co., 3 Stew. 604.*

*Mr. Ruser* and *Mr. McCreery*, for appellant.

*Mr. C. Parker*, for respondent.

This was a suit against the defendant, as the receiver of the Erie Railway, for damages alleged to have been sustained by the plaintiff by reason of the negligence of the employes of the receiver in the management of a train of cars.

The trial took place before the vice-chancellor, who found against the plaintiff. This decision was appealed from.

*Mr. Ruser* and *Mr. McCreery*, for appellants, cited, on the point of contributory negligence:

*Bonnel* v. *D. L. & W. R. R. Co., 10 Vr. 189.; Ernst* v. *Hudson River R. R. Co., 39 N. Y. 61, 32 How. Pr. 61; Bei-*

NOTE.—The court of chancery seems formerly to have had jurisdiction in cases of assaults and trespasses, which were cognizable at common law, but for which the party complaining was unable to obtain redress in consequence of the protection afforded the offender by some powerful baron, sheriff or other officer of the county where the offence occurred.   *1 Story Eq. Jur. § 48.*

The rule that where there is no adequate legal remedy, the court of chancery supplies the defect, only applies to common law, and not to statutory, rights.   *Janney* v. *Buell, 55 Ala. 408; Ryves* v. *Wellington, 9 Beav. 579; Att'y-Gen.* v. *Sheffield Co., 3 DeG. M. & G. 320; Winthrop* v. *Lane, 3 Desauss. 325, note; Eborn* v. *Waldo, 6 Jones Eq. 111; Fletcher* v. *Hooper, 32 Md. 210; Niagara Bridge Co.* v. *Great Western R. R. Co., 39 Barb. 212.*

Palys v. Jewett.

segel v. N. Y. Central R. R. Co., 34 N. Y. 622; Davis v. N. Y. Central R. R. Co., 47 N. Y. 400, 40 N. Y. 9; Newson v. N. Y. Central R. R. Co., 29 N. Y. 390; Dolan v. Del. & Hud. Can. Co., 71 N. Y. 285; Wilds v. Hudson River R. R. Co., 29 N. Y., 315; Con. Imp. Co. v. Stead, 5 Otto 167; Aaron v. Second Avenue R. R. Co., 2 Daly 127, 30 How. Pr. 219; Del. R. R. Co. v. Van Stemberg, 17 Mich. 99; Pitts. &c. R. R. Co. v. Dunn, 56 Pa. St. 280; Mil. &c. R. R. Co. v. Hunter, 11 Wis. 160; Kennedy v. Mayor, 73 N. Y. 365; Macauley v. Mayor, 67 N. Y. 602; Weber v. N. Y. Cent. R. R. Co., 58 N. Y. 451, 67 N. Y. 587; Durant v. Palmer, 5 Dutch. 544; Temperance Hall v. Giles, 4 Vr. 260; Runyon v. Bordine, 2 Gr. 472; Dygert v. Schenck, 23 Wend. 446; Con. v. Smith, 18 N. Y. 79; Wood v. Mears, 12 Md. 515; Jones v. Chambry, 4 N. Y. 63; Ploeldterlt v. Mayor &c. (N. Y. Ct. App.), 10 Alb. L. J. 186; Jones v. R. R. Co., 107 Mass. 261; Judd v. Fargo, Id. 264; House v. Metcalf, 27 Conn. 631; Coulter v. Am. Mer. Un. Ex. Co., 56 N. Y. 588; Dyer v. E. R. R., 71 N. Y. 235; N. J. R. R. Co. v. West, 3 Vr. 91, 4 Vr. 430.

The opinion of the court was delivered by

Beasley, C. J.

In looking into the propriety of trying a case of this kind in chancery, I find in the precedents no warrant whatever

Past torts cannot be redressed in equity. *Monk v. Harper, 3 Edw. 109; Owen v. Ford, 49 Mo. 436; Cobb v. Smith, 16 Wis. 661.*

A mere tort as to personal property gives no jurisdiction (*Davidson v. Floyd, 15 Fla. 667; Long v. Barker, 85 Ill. 431; Du Pre v. Williams, 5 Jones Eq. 96; Taylor v. Turner, 87 Ill. 296; Quinney v. Stockbridge, 33 Wis. 502*); unless joined with some equitable ground of intervention, as account (*Pearce v. Bruce, 38 Ga. 444*).

Mere negligence on the part of agents or others acting in a fiduciary capacity, confers no jurisdiction (*Taylor v. Ferguson, 4 Harr. & Johns. 46; Vose v. Philbrook, 3 Story 335; Furlow v. Tillman, 21 Ga. 150; Russ v. Wilson, 22 Me. 207; Odell v. Mundy, 59 Ga. 641*); aliter, if fraud be mixed with such negligence (*Seabrook v. Underwriters, 43 Ga. 583*); and, it seems, the chancellor may remove a coroner from office for neglect of duty (*Parnell's Case, 1 J. & W. 451; Pasley's Case, 3 Dr. & War. 34*); but will not restrain a party from dismissing an employe (*Thomas v. Supervisors, 56 Ill. 351.* See *Hugg v. Camden, 2 Stew. 6; Butcher v.*

' for such a practice. Such a course is contrary, as it would appear, to fundamental rules. It is not too much to say that damages of this kind have never been ascertained in an English court of chancery. I do not find, even in this country, where a looseness of practice has supervened, incident to the coalescence of law and equity in the same tribunal, a single instance in which such a procedure appears.

The general rule undoubtedly is, that damages, as such, will not be ascertained in equity. Chief Baron Gilbert, in his *Forum Romanum*, thus expresses this inability—his words are : " And it is a general rule that whenever the matter of the bill is merely damages, there the remedy is at law, *because the damages cannot be ascertained by the conscience of the chancellor.*" This is the language of the decisions, both ancient and modern. It is true that there are exceptions to this rule, but those exceptions plainly show its generality and force. Such exceptions rest on the ground of a convenience very nearly akin to a necessity. The compensation afforded sometimes on bills for specific performance, is one of such exceptive instances, and yet even in such class the dominance of the general principle is conspicuous, for there is everywhere running through the decisions an assertion or implication of the inadaptation of a court of equity to the admeasurement of damages in their less tangible forms. The remedy in equity has been, substantially,

*Camden, Id. 478; Sheridan v. Colvin, 78 Ill. 237; Youngs v. Ransom, 31 Barb. 49)*; chancery will prevent an indictment, arrest or other interference with its officers for any irregularity &c. in carrying out its decrees (*Batchelor v. Blake, 1 Hog. 98; Hyde v. Holmes, 3 Moll. 373; Turner v. Turner, 15 Jur. 218, 2 E. L. & E. 130; Pelham v. Newcastle, 3 Swanst. 289; Walker v. Micklethwait, 1 Dr. & Sm. 49; York v. Pilkington, 2 Atk. 302; Aston v. Heron, 2 Myl. & K. 390; Chalie v. Pickering, 1 Keen 749; Mackay v. Blackett, 9 Paige 437; Winfield v. Bacon, 24 Barb. 154; Foot v. Sprague, 12 How. Pr. 355; Peck v. Crane, 25 Vt. 146; Mills v. Kispert, 21 Wis. 387)*; and enjoin the preaching of a sermon on the subject of a pending suit (*Mackett v. Conns, 24 W. R. 845, 3 Cent. L. J. 555*); but it will not interfere with one in arrest under the criminal process of another court (*Stuart v. La Salle Co., 83 Ill. 341.* See *Hall v. Com'rs, 31 How. Pr. 237, note*); or his bail (*Allen v. Hamilton, 9 Gratt. 255*); nor issue a *ne exeat* simply because another court cannot arrest the defendant (*Schubert v. Bull, 4 Ch. Sent. (N. Y.) 33*).

20

in this line of examples, confined to cases in which the compensation or damages to be awarded were simply estimations of the value of lands or other objects of the senses. In some of the decisions the distinction that exists between damages of this latter kind and damages to which no fixed standard is applicable, is sharply defined. *Nelson* v. *Bridges, 2 Beav. 239,* has this aspect, it being the case of a supplemental bill to recover compensation for stone taken from a quarry, to which, according to the determination on the original bill, the complainant was entitled; but Lord Langdale decided that the complainant must bring his suit at law for this injury, on the ground that not only an account of the stone which had been taken was prayed for, but also an ascertainment of the loss that the complainant had sustained by being kept out of the use of the quarry. "It appears to me," says the court, "that the defendants are correct when they say this is a case of damages and not of account, because it is to recover something which cannot be ascertained by taking an account of the profits made; it is to ascertain the amount of the loss which the plaintiff has sustained by being prevented doing that which it has been declared he was entitled to do. I think the proper mode of assessing the amount of damage will be to require the defendants to admit such facts as are necessary, and to allow the plaintiff to bring an action *quantum damnificatus.*"

A negro may not obtain his freedom, if entitled thereto, in chancery (*Peters* v. *Van Lear, 4 Gill 249; Townshend* v. *Townshend, 5 Md. 287; Rumph* v. *Waring, 8 Rich. Eq. 136.* See *Phebe* v. *Quillin, 21 Ark. 490*); nor can officers be enjoined from arresting a man drafted into the army, although the use of the writ of *habeas corpus* was then suspended (*Kneedler* v. *Lane, 3 Grant's Cas. 523* [by a divided court, however]).

The bishop's removal of a clergyman, in pursuance of an ecclesiastical decree, can only be enjoined if his civil rights have thereby been taken away unjustly. *Walker* v. *Wainwright, 16 Barb. 486.* See *Youngs* v. *Ransom, 31 Barb. 49.*

To a bill to restrain defendant from making disclosures affecting complainant's reputation, on the ground that his information was obtained confidentially, he answered, setting up the frauds of complainants in their usual business transactions, and prayed a discovery. —*Held,* they must discover. *Gartside* v. *Outram, 3 Jur.* (*N. S.*) *39.* See *Derring* v. *Chapman, 11 How. Pr. 382.*

And even in assuming this function, in this contracted
sphere, the principle of the court of equity was to call in
the aid of a jury whenever the facts were uncertain or com-
plicated. This is the view of this subject presented by
Judge Story in the chapter of his *Equity Jurisprudence* in
which he treats of the topics of compensation and damages,
and in which, drawing his conclusions from the authorities,
he asserts the correct doctrine to be that damages " should
be ascertained by a jury rather than by the conscience of an
equity judge," and " that the just foundation of equitable
jurisdiction fails in all such cases when there is a plain,
complete and adequate remedy at law." *2 Story Eq. Jur.*
§ *794.*

And it is to be observed that it was not in every case in
which the exercise of such a jurisdiction might have been
highly convenient, that a power, even to this limited extent,
was claimed. In cases of bills for specific performance, such
an authority was oftentimes indispensable, not only to avoid
multiplicity of suits, but in order to enable the court to work
out, with completeness, an equitable result. In other cases
such a power has recently been conferred on the English
court of chancery by express legislation. By the *21 & 22
Vic.*, *c. 27*, whenever equity has cognizance by injunction
against any breach of covenant, contract or agreement, or
against the commission or continuance of any wrongful act,

A debtor cannot be restrained from applying for his discharge as an
insolvent, on the ground that he has removed his property to another
state in order to avoid paying his creditors ( *Croom* v. *Davis, 6 Ala. 40.*
See *Fillingin* v. *Thornton, 49 Ga. 334*) ; but it seems, on proper grounds,
a plaintiff at law may be enjoined from taking the defendant's body in
execution (*Frost* v. *Myrick, 1 Barb. 362.* See *Hays* v. *Ford, 55 Ind. 52 ;
Paine* v. *Puttenham, Dyer 306a*).

The removal of a corpse from a common burial-ground, against the
relatives' consent, may be restrained. *Girard's Case, 5 Pa. Law Journ.
Rep. 68.* See *Wynkoop* v. *Wynkoop, 42 Pa. St. 293 ; 6 Am. Law Rev. 182;
10 Cent. L. J. 303.*

That chancery will enjoin repeated illegal arrests that interfere
with the enjoyment of corporate franchises, see *Christie* v. *Bergh, 15
Abb. Pr. (N. S.) 51;* also, *Davis* v. *Society, 16 Id. 73 ;* but not the
warnings of persons by the police as to the character &c. of houses
which they are passing (*Prendorill* v. *Kennedy, 34 How. Pr. 416 ; Gilbert*

Palys *v.* Jewett.

or for the specific performance of any covenant, contract or agreement, the court can, if it sees fit, award damages to the party injured, either in addition to, or in substitution for, such injunction or specific performance; and such damages may be assessed in such manner as the court shall direct.    Mr. Daniel, in his treatise on *Chancery Practice*, prefaces his statement of the change thus effected with the observation that "formerly the court of chancery had, in no case, power to award damages;" and nothing can more plainly demonstrate the original incompetence of the court to discharge the function in question, than this enabling legislation, when viewed in relation to the class of cases affected by it.

It is also apparent that the current of decisions in this state is entirely in the direction of the line of practice above described.    *Copper* v. *Wells, Sax. 10*, appears to be the first, in order of time, of these cases.    It was a bill for specific performance, in which the complainant sought compensation for permanent improvements which were put upon the land that formed the subject of dispute.    Chancellor Vroom, with characteristic niceness of perception, points to the distinction between the two classes of damages already connoted.    His words are: "But there is a wide distinction between mere damages arising from the non-performance of a contract, which damages may be partly imaginary

---

v. *Mickle, 4 Sandf. Ch. 357; Sterman* v. *Kennedy, 15 Abb. Pr. 201; Chicago* v. *Wright, 69 Ill. 318).*

Threats of personal violence to the agents and employes of a company, if they persist in entering defendant's lands and building their railroad there, as they have a right to do by their charter, does not give equity jurisdiction (*Montgomery & W. R. R.* v. *Walton, 14 Ala. 207*); so, of threats by a purchaser of fixtures to enter the house and remove them, a breach of the peace being imminent (*Hamilton* v. *Stewart, 59 Ill. 330*); so, of threats by an insolvent person to have complainant arrested (*Burch* v. *Cavanaugh, 12 Abb. Pr. (N. S.) 410*); so, of threats to bring an action for an alleged infringement of a trade-mark (*Wolfe* v. *Burke, 56 N. Y. 115*); so, of threats to bring other actions, while one was pending, to recover a penalty for not working a highway (*Hartman* v. *Heady, 57 Ind. 545*); so, of *forcible* entry and detainer (*Lamb* v. *Drew, 20 Iowa 15; Curd* v. *Farrar, 47 Iowa 504; Hamilton* v. *Adams, 15 Ala. 596; McGuire* v. *Stewart, 1 Mon. 189; Saunders* v. *Webber, 39 Cal. 287;*

and partly the result of actual or supposed inconvenience or
loss, and the compensation to which a party is justly enti-
tled for repairs, or beneficial or lasting improvements made
to property, under the faith of an engagement, which is
afterwards discovered to be defective in itself, or impossible
to be executed by the default of the opposite party. In the
one case, the damages can be properly assessed only by a
jury, upon an issue of *quantum damnificatus ;* in the other,
the compensation may be safely ascertained by an inquiry
before a master or commissioners, or, at the discretion of the
court, an issue may be awarded." This, it is evident, was
putting the matter on a strictly legal footing, as it asserted
the jurisdiction, and nothing more than the jurisdiction,
which had been exercised by the English chancellors prior
to the enactments to which attention has just been called,
and at the same time it rejected that extension of authority
which has been effected by force of such enactments.

And this same doctrine is carried through the subsequent
train of decisions. Among these is the judgment in *Berry*
v. *Van Winkle's Ex'rs, 1 Gr. Ch. 269.* This was a bill by a
lessee for specific performance, and it claimed compensation
for permanent improvements and damages occasioned to
the complainant from having been cut off, by the act of the
defendant, " from his usual supply of water," and by having
been deprived of certain other facilities to which he was

---

*Comstock* v. *Henneberry, 66 Ill. 212; Rapp* v. *Williams, 1 Hun 716; Win-
terfield* v. *Stauss, 24 Wis. 394*). *Aliter,* where an equitable ground for
interference exists ( *Crawford* v. *Paine, 19 Iowa 172; Hillebrant* v. *Barton,
39 Tex. 599; McIntyre* v. *Hernandez, 7 Abb. Pr. (N. S.) 214*).

That defendant seduced complainant's infant daughter, and, to
avoid redress at law, fraudulently disposed of his property and then
absconded, gives no jurisdiction (*Meres* v. *Chrisman, 7 B. Mon. 422*) ;
nor, that the defendant, in order to escape his statutory liability, as
her putative father, to support complainant, had removed from the
state, leaving property (*Simmons* v. *Bull, 21 Ala. 501;* see *Furrillis* v.
*Crowther, 7 Dowl. & R. 612; Moncrief* v. *Ely, 19 Wend. 405*); nor, that
defendant maltreated his apprentice, the complainant (*Argles* v. *Hease-
man, 1 Atk. 518*).

Penalties for violating statutes cannot be enforced in equity (*Kerr* v.
*Preston. L. R. (6 Ch. Div.) 463; Hamersley* v. *Germantown Co., 8 Phila.
314; Hudson* v. *Thorne, 7 Paige 261; Schwab* v. *Madison, 49 Ind. 329;*

entitled under his contract.    But this latter branch of the complainant's claim was declared by the court to be beyond its jurisdiction, the chancellor, with respect to the general rule, saying: "In all cases resting in damages only, it is certainly more in accordance with our system of jurisprudence that they should be ascertained at law, where the jury can pass upon them, and the witnesses are seen and examined in open court."·

Of the same legal import is the case of *Hopper* v. *Lutkins, 3 Gr. Ch. 149.* This was an injunction bill to restrain a suit at law on a note given for the purchase-money of a tract of land which the defendant had conveyed to the complainant, on the understanding that a certain dam, then erected, stood at its proper height, and that the complainant had suffered great damage by not being able, as against a superior legal right, so to maintain it. The court denied its competency to entertain such a question with respect to damages, remarking that such a matter differed fundamentally from the inquiry which arises when a vendee fails to obtain all the land intended to be conveyed, and in which instance, in a proper case, an allowance by way of compensation for such loss will be made, as the amount of such compensation may readily be made in equitable modes. This, again, is but an application of the English rule as it originally existed.    See *Iszard* v. *Mays Landing Co., 4 Stew. 511.*

*West* v. *New York, 10 Paige 539; Wallack* v. *Society, 67 N. Y. 23; Cohen* v. *Goldsboro, 77 N. C. 2; Lamport* v. *Abbott, 12 How. Pr. 340; Gordon* v. *Lowell, 21 Me. 251; Moses* v. *Mobile, 52 Ala. 198; Burnett* v. *Craig, 30 Ala. 135);* nor a *mandamus* be enjoined (*Montague* v. *Dudman, 2 Ves. Sr. 396; Neuse River Co.* v. *New Berne, 6 Jones 204; Columbia Co.* v. *Bryson, 13 Fla. 281);* nor a *certiorari* issued (*Berry* v. *Hardin, 28 Ark. 458);* nor a *quo warranto* (see *Att'y-Gen.* v. *Bank, 1 Hopk. Ch. 354; Lewis* v. *Oliver, 4 Abb. Pr. 121; Campbell* v. *Taggart, 10 Phila. 443; Tyack* v. *Brumley, 1 Barb. Ch. 519);* nor a prohibition (*Bean* v. *Pettengill, 2 Abb. Pr. (N. S.) 58).*

Although chancery has no jurisdiction to enjoin the prosecution of a crime (*2 Story's Eq. Jur. ¿ 893; Holderstaffe* v. *Saunders, 6 Mod. 16; Emperor of Austria* v. *Day, 3 DeG. F. & J. 253; Cox* v. *Paxton, 17 Ves. 329; Sparhawk* v. *Union Pass. R. R., 54 Pa. St. 401; Joseph* v. *Burk, 46 Ind. 59; Gault* v. *Wallis, 53 Ga. 675; Fletcher* v. *Hooper, 32 Md. 210; Campbell* v. *Scholfield, 2 Pittsb. 443; Van Rensselaer* v. *Griswold, 3 N. Y.*

· It will, therefore, be observed from this brief review of some of the more important of the authorities, that even when a contract had been broken, it was the general principle of equity, as it existed originally in England, and at all' times in this state, that where damages were of an intangible character, they could not be admeasured under the authority of the chancellor. Nor am I aware that, with respect to torts to the person, it was ever so much as suggested, within such jurisdictions, that the compensation to be awarded in consequence of such malfeasances could, by force of any conjuncture of circumstances, be ascertained in a court of equity.

Such, then, being the usual principle, the question remains, whether it becomes modified, or, rather, altogether abolished, when a receiver appointed by the court is the wrong-doer. The actionable injury in the present case arose from the neglect of one of the employes of such receiver, and the inquiry, therefore, is, whether that quality of the transaction draws to the court of equity cognizance of the litigation. It is claimed that, under such a form of proceeding, although the action is for a tort to the property and person, the chancellor can, in his discretion, try the law and the facts and assess the damages. We have seen already that, if such a jurisdiction exists in equity, it is, to a very remarkable degree, inconsistent with the ordinary principles on

Leg. Obs. 94) ; yet the drawing of a legalized lottery may be restrained, if irregular (State v. Maury, 2 Del. Ch. 141; State v. Eddy, Id. 269) ; or the distribution of prizes drawn, on which proceedings to declare them forfeited have been begun (People v. Kent, 6 Cal. 89) ; or proceedings on a judgment obtained against complainant on a bond to which his name had been forged (Reynolds v. Dothard, 7 Ala. 664; Jameson v. Deshields, 2 Gratt. 4) ; or a conspiracy to defraud complainant (Dwinal v. Smith, 25 Me. 379) : or a nuisance on which the trial of an indictment is pending (Raleigh v. Hunter, 1 Dev. Eq. 12; and see Att'y-Gen. v. Cleaver, 18 Ves. 220; Gilbert v. Mickle, 4 Sandf. Ch. 357) ; or where a subsequent indictment is not for exactly the same injury (Saull v. Browne, L. R. (10 Ch. App.) 64) ; or where an embezzler was dead, and his widow having placed his money in the bank from which he embezzled, began proceedings, as administratrix, to recover it, and to an injunction by the bank restraining her, she demurred, on the ground that

which a court of this class proceeds, and that in this depart-
ment it attempts to do what in all other departments it is
said to be illy adapted to do. In view of the striking incon-
sistency, if such a practice exists in this particular class of
cases, we would expect to find strong reasons for such a
diversity, as well as repeated precedents testifying to its
prevalence; but, upon examination, I find neither such
reasons nor such precedents.

It does not seem to me that there is anything in the
nature of the affair that has even a tendency to legitimate
such a course. The claim in such a case is purely a legal
one, and without a single feature distinguishing it from the
ordinary matters which are tried at common law. The
plaintiff must recover, if he recovers at all, by force of legal,
and not of equitable, rules. The damages are not suscep-
tible of any exact estimation, their only measure being
an experienced judgment. It is universally admitted that,
according to the theory in which our jurisprudence is
founded, such questions are not adapted to the judicial
methods of a court of equity: such questions are univer-
sally, with this exception, if such exception exists, confided
to the courts of common law. Such damages as these have
always been assessed by a jury.

Why, then, should there be a deviation, in these particu-
lar instances, from this clearly-marked track? I am unable

the bill alleged a felony (*Wickham* v. *Gatrill, 2 Sm. & Giff. 353.* See
*Crowne* v. *Baylis, 31 Beav. 351*).

So an ecclesiastical court may entertain a suit to suspend a clergy-
man, on a charge that constitutes a criminal offence. *Burder* v.
———, *3 Curt. 822.*

Generally, if an indictment or public remedy is adequate, equity will
not interfere (*Att'y-Gen.* v. *Heishon, 3 C. E. Gr. 410*, and cases cited;
*People* v. *Horton, 5 Hun 516*); but the attorney-general may, *semble,* sue
in equity, even for a legal demand (*Att'y-Gen.* v. *Galway, 1 Moll. 95;
Att'y-Gen.* v. *Railroad Co., 35 Wis. 425.* See *Att'y-Gen.* v. *Tudor Ice Co.,
104 Mass. 239*).

In the following cases it has been held that a receiver of an insolv-
ent railroad is not an agent or servant of the company, and hence that
the company is not liable for damages occasioned by his negligence
while operating the road: *Metz* v. *Buffalo R. R. Co., 58 N. Y. 61; Ohio*

Palys v. Jewett.

to perceive that it is founded in any circumstance of conve-
nience, much less in any necessity. The settlement of these
claims in the common mode, by a suit at common law, in
nowise jars with the due execution of his office by the
receiver. Such a suit does not disturb, or even affect, the
receiver's possession of the property entrusted to him by
the court, for, if a judgment ensue, it cannot, without an
application to the chancellor, be enforced by levy on such
property. And, for the same reason, it does not interfere
with the absolute control vested in the court of equity over
the property sequestered. It tends to embarrass, therefore,
neither the court nor the officer of the court; all that it does
is to settle the legal right and the amount of the damages
in that method, which, in the adjustments of our legal sys-
tem, is deemed the easier and the better. Nor can it be
overlooked that a strong argument *ab inconvenienti* can be
urged in behalf of the party seeking redress against this
claim of equitable cognizance. It certainly imposes great
burthens upon such a litigant. In the present instance the
hearing was before the vice-chancellor, and the testimony
was, therefore, taken *viva voce;* but such a circumstance, if
this species of jurisdiction be admitted, is not a necessary
incident to the proceeding: the entire testimony may be
taken in writing in the mode customary in the practice in
chancery: and to try a question of tort in such a manner,

R. R. v. Davis, 23 Ind. 553 ; Hopkins v. Connel, 2 Tenn. Ch. 323; Bell v. Indianapolis R. R., 53 Ind. 57 ; Erwin v. Davenport, 9 Heisk. 44 ; State v. Consolidated R. R. Co., 67 Me. 479. Contra, Lamphear v. Buckingham, 33 Conn. 237 ; Klein v. Jewett, 11 C. E. Gr. 474, 12 C. E. Gr. 550 ; White v. Keokuk R. R. (Iowa), 9 Cent. L. J. 497, 20 Alb. L. J. 455 ; Meara v. Holbrook, 20 Ohio St. 137. See Kinney v. Crocker, 18 Wis. 74; Davenport v. Ala. R. R., 2 Woods 519 ; Safford v. People, 85 Ill. 558 ; Allen v. Central R. R., 42 Iowa 683 ; Daniels v. Hart, 118 Mass. 543. Nor is the receiver personally liable (Cardot v. Barney, 63 N. Y. 281; Camp v. Barney, 4 Hun 373 ; Kain v. Smith, 11 Hun 552 ; Henderson v. Walker, 55 Ga. 481); although such company is liable for loss as a carrier (Blumenthal v. Brainerd, 38 Vt. 402 ; Morse v. Brainerd, 41 Vt. 550 ; Paige v. Smith, 99 Mass. 395 ; Newell v. Smith, 49 Vt. 255 ; Cowdrey v. Galveston R. R., 93 U. S. 352 ; Nichols v. Smith, 115 Mass. 332; Barter v. Wheeler, 49 N. H. 9; Pearson v. Wheeler, 55 N. H. 41).—Rep.

would be, it is conceived, both expensive and unsatisfactory. It is certainly not too much to say that, if an action for negligence, resulting in injury to the person, can be tried in equity as well as it can at law, there is not the least propriety in maintaining the two systems in their distinct forms. In addition to these defects, the party injured, in order to reap the benefit of his litigation, would be obliged to sustain his case twice upon the merits, once in the court below and once in this court. If it had appeared that a trial in equity of a matter of this kind had possessed the merit of convenience, it would not have gone far in establishing a title to such jurisdiction; but even this imperfect support seems to be wanting.

With regard to precedents indicating the possession of such a jurisdiction by courts of equity, I have not found one wearing such a semblance. The course of the English chancery on this subject appears not to have been settled until a comparatively recent period, but is now quite clearly defined. At no stage of such practice are there any indications, even in the faintest degree, that the prerogative was claimed to take cognizance of all the litigations in which the receiver was a party. The power exercised was this: to prevent the property put in trust in the hands of the receiver from being taken from him without the assent of the court, and to protect that officer from molestation by baseless litigation. But the method by which these ends were accomplished was not by an assumption of jurisdiction over all actions, whether legal or equitable, brought against the receiver, but by the expedient of requiring, as a prerequisite to such suits, the assent of the chancellor. When such an application was made, unless it plainly appeared that the alleged right of action had no foundation, and that the proceeding would be merely vexatious, the assent of the court to the bringing of the action was given, not as a matter of grace, but *ex debito justitia*. Neither in any case, nor in any judicial expression, have I found any indication of a claim on the part of the chancellor of a right to try

questions of tort, and, with respect to all doubtful legal
questions, it has ever been the right of the party litigating
with the receiver to have his case tried at law.

Even that measure of control that prevented a suit being
prosecuted against its receiver, without the permission of
the court, cannot, perhaps, be said to have been fully estab-
lished at the time the English decisions ceased to be impera-
tive authority in the courts of this state. *Angel* v. *Smith,*
which came before Lord Eldon in the year 1804, and is
reported in *9 Ves. Jr. 335,* is the leading case upon the sub-
ject. Before that time the practice was settled for encum-
brancers on the property sequestered to come into equity
and be examined *pro interresse suo,* and the court, as is now
done on a foreclosure bill, proceeded to settle the rights
and priorities. See *Bowles* v. *Parsons, 1 Dick. 142; Ham-
lyn* v. *Lee, Id. 94; Hunt* v. *Priest, 2 Dick. 540.* But in
the first case just referred to, the question was distinctly
presented, whether an ejectment would lie against the
receiver without the chancellor having first sanctioned the
proceeding. The action had been brought without asking
permission. The point was treated by both court and
counsel as an open one, it being urged, in argument, that it
had "never been decided that, where a receiver had been
appointed, a person claiming under a legal title, not derived
in the cause, may not bring an ejectment." Lord Eldon
appeared to be in doubt with respect to the rule of practice,
and he appealed to the register of the court for information.
The register "apprehends" that such motions for leave to
bring suit have been made, and then the chancellor says:
"There may be inconvenience in that, but the inconvenience
the other way is enormous. If it is necessary to ask leave,
the court must have credit for never refusing it when it ought
to be granted; and, if so, very great purposes of conveni-
ence may be answered by putting the party to ask it." He
adds: "The court certainly would not require a man to
disclose all his evidence in the master's office. That would
be a very oppressive mode." Then the opinion concludes

by this formulation of the doctrine : "If the court will permit its decree to be disturbed by persons having, or pretending, title, nothing could be more easy than to prevent the execution of the decree. It will permit it, whenever there is a legal right to disturb it. The only question is, whether the court, having taken possession, should not be informed whether it is a proper case; and I desire it to be considered as my opinion that an ejectment cannot be brought, without leave of the court, where there is a receiver."

I have thus emphasized this case because, as I have said, it is the case always referred to on this subject, and because it clearly marks out the line of practice. The limits of the practical rule are here very plainly settled. It establishes that permission to sue must be asked, and that the court will look into the title, and if the claim be obviously frivolous, permission to sue will be denied. So, if the title were incontestably clear against the receiver, the court certainly would have the power to relinquish the property to the claimant. And this is the entire control that Lord Eldon claimed, for, so far was he from asserting any right to try the case as against the plaintiff, that he expressly declares "the court would not require a man to disclose all his evidence in the master's office. That would be a very oppressive mode."

This is the rule that is, in substance, conformed to in the subsequent decisons, and the views thus expressed by Lord Eldon have never, so far as is observed, been brought in question. *Brooks* v. *Greathed, 1 J. & W. 175 ; Dunne* v. *Farrel, 1 Ball & B. 123 ; Gresley* v. *Adderley, 1 Swans. 578 ; Ames* v. *Trustees of Birkenhead Docks, 20 Beav. 332.*

From this practice Vice-Chancellor Kindersley appears to have deviated in the case of *Ranfield* v. *Ranfield, 1 Drew. & Sm. 314.* The facts were these : A receiver was in possession, and the lord of the manor asked leave to enter upon the property and take the rents and profits, and the vice-chancellor considered that it was plain that he had no

right, and so decided against his title. But this step was disapproved of on appeal, Lord Justice Turner thus commenting upon it: "That decision appears to me to be exceedingly strong, for there can be no doubt that if the court was not in possession of the estate by its receiver, the lord would be entitled to seize, in order to try the question whether the devisee was bound to take admittance or not; and it is not, as I apprehend, according to the course of the court, to refuse liberty to try a right which is claimed against its receiver, unless it is perfectly clear that there is no foundation for the claim. The vice-chancellor's decision went, therefore, the full length of saying that the lord had no possible claim; and his honor, indeed, has so put the case in giving judgment. I am certainly not prepared to go that length, and unless, therefore, all the parties interested had been desirous that we should decide the question of right, and had been content to abide by our opinion upon it; subject, of course, to an appeal to the House of Lords, I think that leave must have been given to seize, in order that the question of right might be tried."

These observations constitute a pointed re-affirmation of the proper rule of practice as promulgated by Lord Eldon, establishing plainly, as they do, that in this class of cases the chancellor will not undertake to decide a purely legal question against the person who demands from him a trial at law. And it seems superfluous to say that if it be abnormal for equity to pass upon so simple and uncircumstantial a question as a claim to realty, because such a subject belongs to common law cognizance, the supposition that such a tribunal can entertain an action for tort to the person becomes unreasonable in the extreme. If a proposition to take charge of such a suit has ever been made to the English chancery, it has escaped my attention. Nor have I found that such a course has been taken by the courts of any of the states of this Union. My conclusion is, that the jurisdiction exercised in this case has no footing in judicial recognition or in any principle of practice.

Nor is the doctrine thus repudiated sustained by consid-erations of justice or public policy. We have seen that the doctrine is not necessary either to the court or to its officers for the proper discharge of their functions. Its prevalence would impose an unnecessary and severe burthen on the party seeking redress. It would give the receiver an incon-gruous and unfair advantage, for while he undoubtedly would have his action at law for all torts affecting him offi-cially, the advantage of that mode of trial would be denied to his opponent. The existence of the power would seem to be as undesirable as its title is in point of law unfounded.

Nor would its existence in the practice of our own courts harmonize with the arrangements of our legal system. The constitution, in its provisions establishing the inviolability of the trial by jury, must be regarded as admonitory to the courts to guard against every attempt to encroach on the legit-imate sphere of that favored mode of redressing injuries. And the very statute which provides for the winding up of insolv-ent corporations through the apparatus of a receivership, is careful to preserve this right, for, with respect to mere money claims presented to the receiver, it ordains that either that officer or the creditor may require the controversy to be submitted for decision to a jury under the direction of a justice of the supreme court. To preserve this right in such instances of accounts, and at the same time to aban-don to equity the unaccustomed field of strictly legal rights, and such remedies as trespass and ejectment, would be an adjustment of procedure that would seem quite preposter-ous. In point of fact, this statutory provision restricts the operation of the rule of equitable practice as propounded by Lord Eldon, for, under that rule, these matters of account would be definitively ascertainable in chancery; but in all other respects that rule remains unmodified, and exists as one of the modes of equitable procedure.

The result of this review of the subject is, that in my judgment the plaintiff in this case was entitled, as a matter of right, to a jury trial. But the order refusing him such

right has not ·been appealed from, as it unquestionably might have been; and as both parties submitted to a trial before the vice-chancellor, I have concluded, though not without some misgiving, that the decision · rendered in the court below is susceptible of being reviewed on the merits on this appeal. An analogous course appears to have been taken in the before-cited case of *Ranfield* v. *Ranfield.*

Coming, then, to the merits of the case involved in the issues of fact, this court has concluded that this decree must, with respect to them, be reversed. We think this result must obtain on the admitted circumstances as they are drawn from the proofs and stated by the vice-chancellor. The defendant left a car standing on a siding at night, within the limits of a highway. Such an occupation of a public road, either by a railroad company or by an individual, was illegal. This company had but the right of transit across this road; the highway could not be used through the night as a station for railroad cars. The car in question, therefore, was illegally placed, and the company must be held responsible for every injury resulting in the usual course of things from such unlawful appropriation of this highway. Whether the misconduct of the plaintiff's horse on this occasion was the product, in a legal sense, of this misfeasance, is the · only question on which I have had any serious doubt, but upon consultation with the other members of the court, and deferring to the great preponderance of opinion against my first inclination, that doubt has been dissipated. We think that the position of this car was such as to be naturally productive of fear in horses passing at this point in this public highway, and that a man ·of ordinary prudence, when leaving the car in that position, would, unless neglectful, have foreseen the danger. This being so, it results that the carelessness of the employes of the defendant became in law the cause of the injury in question.

The remaining question, with respect to the liability of the defendant, is, whether or not the conduct of the plain-

tiff was such as to defeat a recovery in this case. The vice-chancellor found a contribution of negligence in such conduct, and on this sole ground pronounced against him. The view thus ·taken imputed to the plaintiff two acts of negligence, first, in attempting to cross the railroad track under the circumstances; and, second, in his behavior and in the management of his horse at the crisis of his danger.

This court cannot agree with either of these constructions. We think it clearly appears, according even to the facts as settled in the judgment of the court below, that the act of the plaintiff in driving upon the track as he did, is not evincive of negligence. It is true that the plaintiff may have been aware that a train of cars was then about or exactly due, although he testifies that such was not the case; but such knowledge would properly have only had the effect of putting him on the alert for symptoms of danger. He surely could not be required to wait indefinitely until the train had actually passed. His eyes and ears, under the circumstances, for the view was unobstructed and the night was still, could be safely trusted, and the evidence is uncontradicted that he put them to proper use. It is also uncontradicted, and the point is established beyond any doubt whatever, that, as a matter of fact, he had ample time to cross the railroad under any ordinary conditions. The vice-chancellor seems to think that the evidence leads to the conclusion that he had a minute and forty seconds within which to escape from his danger, after his horse stopped upon the track. If this be so, is it not demonstrably clear that the act of attempting to cross was a prudent act? There is no testimony to show that the horse of the plaintiff was vicious or inclined to baulk. The plaintiff had no reason to believe that the crossing over the railroad was in any way obstructed, in whole or in part, or that there was any object before him calculated to frighten his horse. We think the proofs entirely absolve the plaintiff, therefore, from all imputation of being careless in endeavoring to cross this railroad at the time in question.

Nor, on the other score, can we think the plaintiff charge-able with culpability. His situation, from no fault of his own, was a trying one. After getting on the track, his horse, becoming alarmed at the car which we have said had been illegally left at that point, became restive and refused to proceed. The plaintiff, by rein and whip, strove to urge him forward, but did not succeed, the consequence being that the train came upon him whilst thus endeavoring to escape. It is said that the moment the horse stopped it was the duty of the plaintiff to look towards the point of danger, and, if so, he could have averted the disaster, or, at least, made a safe escape himself. It is not apparent how the disaster could have been averted, and, with respect to the personal escape of the plaintiff, the question is not whether he could have done so, but whether he is, in a legal sense, culpable from omitting to make the attempt. To judge the plaintiff fairly, we must assume, in imagination, as nearly as possible, his situation at the critical moment. When his horse stopped and refused to proceed, of course he knew the danger was imminent, but was it out of the usual line of prudence for him to resort to the voice, the reins and the whip as a means of escape? This would seem to be the natural first course which every man would take. And if it be said that, after making such trial and finding it would not succeed, the attempt should have been aban-doned, the suggestion arises, When has such trial been fairly made—is it complete after the first, second or third blow with the whip has been struck? Would not a reasonable expectation continue that the horse could be forced in this way out of the reach of the danger? And who can say when the stage of the affair had been reached where it was the clear dictate of prudence to abandon the attempt? Even on the retrospect it is not easy to form a judgment on the subject. There was a boy in the wagon, and the idea of abandoning him and his horse to certain destruction would not naturally arise in the mind of the plaintiff.

But it seems to the court that there is a higher range of consideration applicable to this question. Upon the admission that the plaintiff at this juncture did not act with prudence, it does not follow that he is without redress. He was unexpectedly, and without fault on his part, placed in a situation of great peril, and if consequently he lost his head, and on that account his conduct was not exactly adjusted to the exigency, still he is not chargeable with legal negligence. The test is, What would a man of ordinary prudence have done under the circumstances? but there is no rule that says such a man may not have his faculties confounded by a great and sudden jeopardy. All experience shows that no human being can be altogether relied on for self-possession, coolness and prompt conduct on such occasions, and, in estimating the conduct of the plaintiff, this human infirmity must be borne in mind. Carelessness is not imputable to a person unless he has, with respect to the occasion, an opportunity to observe and draw a conclusion and to act on such conclusion. The emergency thrown upon the plaintiff by the wrongful act of the defendant was so sudden and overwhelming that we think it is quite impracticable to test the plaintiff's conduct by a standard that might be well enough when used with respect to ordinary occurrences. Even if the plaintiff lost his balance and acted somewhat irrationally, such a result must be laid to the account of the defendant. The defence of contributory negligence is not sustained.

This result has, of necessity, compelled this court to adjudge the amount of damages to which the plaintiff is entitled. We are of opinion he should recover the sum of three thousand dollars.

Let the decree be reversed and the record remitted with proper instructions.

Decree unanimously reversed.